Luis CERVANTES SALAZAR, TDCJ
No. 999285, Petitioner,

v.

Douglas DRETKE, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

No. Civ.SA–03–CA–175–FB.

United States District Court,
W.D. Texas,
San Antonio Division.

Sept. 27, 2005.

Michael Clark Gross, Law Office of Michael C. Gross, San Antonio, TX, for Petitioner.

Fredericka Sargent, Assistant Attorney General, Office of the Attorney General, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

BIERY, District Judge.

Petitioner Luis Cervantes Salazar filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his September, 1998, Bexar County capital murder conviction and sentence of death. For the reasons set forth below, petitioner is not entitled to federal habeas corpus relief from this Court but is entitled to a Certificate of Appealability on a single claim.

### I. Statement of the Case

#### A. The Offense and its Aftermath

There is no genuine dispute as to the operative facts of petitioner's offense. During the early morning hours of October 11, 1997, petitioner crawled through the front window of the home of Martha Sanchez and Danny Ochoa at 250 Future in San Antonio, Texas, went into the kitchen where he obtained a pair of knives, and then proceeded to Martha's bedroom where he stabbed her multiple times, at least twice fatally.[1] When Martha's ten-

---

1. Petitioner testified at the guilt-innocence phase of his trial that, after a night of drinking heavily, smoking marijuana, and ingesting cocaine at a friend's apartment, he went to a nearby taco stand and then decided to "crash" at a nearby home (at 254 Future) belonging to his mother-in-law where he and his family had resided until about a month to a month-and-a-half before that date. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 17, testimony of Luis Salazar, at pp. 61–67. Petitioner claimed he mistakenly climbed through the front window of the house next door (at 250 Future) and, upon hearing noises, went to the kitchen, where he found a pair of knives because he was frightened. Id., at pp. 68–72. When he "bumped into" someone in the hallway, he instinctively stabbed that person and there was a scuffle. Id., at pp. 73–74. As he continued to "defend himself," petitioner claimed he felt a sharp pain in his right arm,

year-old son Erick Martinez awoke to the sound of a struggle, he went to his mother's bedroom, where he observed the petitioner, whom Erick recognized as a former neighbor, stabbing his mother.[2] As petitioner stabbed her, Martha screamed "Luis, why are you doing this? Leave me alone."[3] When Erick attempted to grab one of the knives, the petitioner turned and stabbed Erick in the chest.[4] At that point, Martha yelled for Erick to go get help.[5] Fleeing the house, Erick banged on the doors of several neighbors before he awoke Sylvia Montenegro.[6] Sylvia sent her daughter's boyfriend, Adrian Gonzales, to the victim's house and telephoned the authorities.[7] Adrian opened the screen door at the front of the victim's house and coaxed Erick's two-and-a-half-year-old sister Brianna from the front hallway out through the front door.[8] Sylvia then arrived and directed Adrian to enter the house and attempt to locate Erick and Brianna's six-month-old brother Timothy.[9] When he entered the back bedroom, Adrian found a bloody knife laying on top of the apparently dead Martha on the floor between her bed and Timothy's crib.[10] Adrian picked up the knife and placed it on a paper towel on the coffee table in the living room, where police later found it.[11]

---

he turned, and he stabbed someone who was behind him. *Id.*, at pp. 75–76. Petitioner admitted that Martha yelled "Erick" *before* petitioner stabbed the boy but claimed that only after he stabbed the boy did he realize he was in the wrong house. *Id.*, at pp. 76–77. At that point, petitioner fled the house. *Id.*, at pp. 77–78.

The autopsy performed on Martha Sanchez's body established: (1) Martha Sanchez died as a result of multiple stab wounds, (2) more specifically, Martha suffered five stab wounds to the chest and one to the neck, (3) one of those wounds penetrated into her heart and would have been fatal by itself, (4) another wound cut through her aorta and likewise would have been sufficient to cause her death by itself, (5) Martha also suffered multiple contusions on both her forearms and non-fatal stab wounds to her breast and neck, (6) a foamy material found in her mouth indicated her death did not occur instantaneously but, rather, suggested her heart slowed down over a period of time as fluid built up in her lungs and a frothy mixture of blood and air was forced from her lungs into her throat, (7) a pattern of contusions and abrasions to Martha's legs, as well as mud stains on her feet and legs, suggested that someone attempted to force her legs apart while she resisted vigorously, (8) while there was no evidence of injury to Martha's genitals, and no presence of semen, nonetheless, the pattern of bruising and injury to her legs indicated someone had attempted to sexually assault Martha, and (9) the pattern of Martha's injuries was consistent with attempted sexual assault. S.F. Trial, Volume 16, testimony of Jan Garavaglia, at pp. 216–40.

2. S.F. Trial, Volume 17, testimony of Erick Martinez, at pp. 14–16.

3. S.F. Trial, Volume 17, testimony of Erick Martinez, at p. 14.

4. *Id.*, testimony of Erick Martinez, at pp. 17–19.

5. *Id.*, testimony of Erick Martinez, at p. 19.

6. *Id.*, testimony of Erick Martinez, at pp. 19–22.

7. S.F. Trial, Volume 15, testimony of Sylvia Ann Montenegro, at p. 73–78; Volume 16, testimony of Adrian Gonzales, at pp. 189–90; Volume 17, testimony of Erick Martinez, at pp. 22–23.

8. S.F. Trial, Volume 16, testimony of Adrian Gonzales, at pp. 194–96.

9. S.F. Trial, Volume 15, testimony of Sylvia Ann Montenegro, at pp. 83–84; Volume 16, testimony of Adrian Gonzales, at p. 196.

10. S.F. Trial, Volume 16, testimony of Adrian Gonzales, at pp. 197–98.

11. S.F. Trial, Volume 16, testimony of Adrian Gonzales, at pp. 197–98.

San Antonio Police found a bloody kitchen knife on top of a coffee table, a photograph of which was admitted into evidence as State

Adrian next removed a twisted blanket that was wrapped around Timothy's neck and carried the still-breathing baby out to the front porch as police arrived.[12] At the scene, Erick identified petitioner as his mother's assailant to Sylvia, to another neighbor who arrived shortly thereafter, to a police officer, and to a paramedic.[13] Emergency medical personnel then took Erick to the hospital where he was treated for his chest wound and where Erick gave a homicide detective a formal statement in which he once again identified petitioner as the person who had stabbed both himself and his mother.[14]

Petitioner telephoned police on the evening following the murder from the home of a relative and surrendered without incident.[15] Following his arrest, petitioner asked one police officer how the victim was doing and, when informed that she was dead, petitioner inquired whether he would receive life or death.[16] Petitioner spontaneously asked another police officer whether someone who killed another person would "get the needle." [17]

## B. *The Indictment*

On December 18, 1997, a Bexar County Grand Jury indicted petitioner in cause no. 97–CR–6077 on a single count of capital murder, alleging two theories of that offense: that petitioner intentionally and knowingly murdered Martha Sanchez by stabbing her with a deadly weapon, i.e., a knife, while in the course of committing or attempting to commit the predicate of-

---

Exhibit no. 16. S.F. Trial, Volume 15, testimony of Frank Martinez, at pp. 93–94.

Police also videotape recorded the crime scene as they found it. The videotape showed the knife on the coffee table in the location Adrian Gonzales had left it. S.F. Trial, Volume 15, testimony of Odell Johnson, at pp. 175–77. Police also discovered a second knife in the grass next to the door. *Id.*

The bloody knife found on the coffee table, which appeared to be bent, was admitted into evidence at petitioner's trial as State Exhibit no. 36. S.F. Trial, Volume 15, testimony of David Payne, at pp. 210 & 212.

**12.** S.F. Trial, Volume 16, testimony of Adrian Gonzales, at p. 199.

**13.** S.F. Trial, Volume 15, testimony of Sylvia Ann Montenegro, at p. 82; testimony of Josie Garcia, at pp. 112–15; testimony of Edward Folkes, at pp. 136–37; testimony of David Edward Lohans, at p. 159.

**14.** A police officer and paramedic, who each rode to the hospital with Erick, testified at petitioner's trial that the boy appeared very frightened and concerned for his mother but, despite Erick's apparent shock, he had been fully capable of explaining what had transpired. S.F. Trial, Volume 16, testimony of Henry Frank Keil, at pp. 115–18; Volume 16, testimony of Steve Bilestein, at pp. 125–30.

The San Antonio Police Homicide Detective who interviewed Erick at the hospital testified: (1) the boy was visibly shaken and upset but nonetheless fully capable of furnishing a hand-written statement regarding the incident and (2) Erick identified a photograph of petitioner as that of his attacker. S.F. Trial, Volume 16, testimony of Michael Olan Stark, at pp. 133–37.

**15.** Petitioner testified he telephoned 911 on the evening following the murder and informed the operator he had awakened that morning with blood on his hands and was afraid he might have harmed someone. S.F. Trial, Volume 17, testimony of Luis Salazar, at pp. 82–83. Petitioner admitted, however, he had not in fact awakened with blood on his hands or clothing. *Id.*, at pp. 83–84.

The two police officers who arrived at the location given by petitioner during his 911 call testified petitioner offered no resistance to his arrest and petitioner was given his *Miranda* warnings at the time of his arrest. S.F. Trial, Volume 16, testimony of Pablo Arriaga, at pp. 43–45, 50, & 54–55; testimony of Robert Hinojosa, at pp. 69–70.

**16.** S.F. Trial, Volume 16, testimony of Pablo Arriaga, at p. 46.

**17.** *Id.*, Volume 16, testimony of Robert Hinojosa, at p. 72.

fenses of aggravated sexual assault and burglary.[18]

## C. Guilt–Innocence Phase of Trial

The guilt-innocence phase of petitioner's trial began on September 8, 1998.

### 1. Petitioner's Account of the Events

Petitioner admitted during his trial testimony he had stabbed both Martha Sanchez and Erick Martinez but claimed he had mistakenly entered their home on the night in question due to his intoxicated condition and acted solely in self-defense.[19] Petitioner denied possessing any intent to kill, denied the intent to burglarize, and denied that he had attempted to sexually assault Martha.[20] Petitioner also testified he had fled the crime scene on a bicycle all the way to his residence in another part of the city.[21]

However, petitioner admitted that several months before he moved out of the house adjacent to the victims' home, he had made a sexual advance toward Martha which she rebuffed and resulted in Martha's husband rebuking petitioner and warning him to stay away from Martha's home.[22] Petitioner also admitted he had

---

**18.** Multiple copies of petitioner's indictment appear throughout the state court records submitted to this Court by respondent on April 16, 2003. The indictment appears at page 13 of volume I of II of the transcript of pleadings, motions, and other documents filed in petitioner's trial court proceedings (henceforth "Trial Transcript"). Another pair of copies of the indictment appear at pages 63 and 90 of the transcript from petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript").

On July 13, 1998, the state trial court granted the prosecution's motion to amend the indictment to modify the paragraph alleging burglary as the predicate felony offense which elevated petitioner's murder of Martha Sanchez to that of capital murder. Trial transcript, Volume I of II, at pp. 65–68. The amendment merely deleted Sanchez's name as the person against whom the offense of burglary had been committed but otherwise made no substantive change in the charge against petitioner.

**19.** S.F. Trial, Volume 17, testimony of Luis Salazar, at pp. 67–76.

**20.** Id., testimony of Luis Salazar, at pp. 77–78.

**21.** Id., testimony of Luis Salazar, at p. 79.

San Antonio Police Officers testified: (1) during the search for petitioner, a bicycle was discovered at petitioner's 122 Ashland address, (2) police took custody of a bicycle found leaning up against a tree at 122 Ashland, petitioner's place of residence on the date of the offense, and (3) no one at that address knew to whom the bike belonged. S.F. Trial, Volume 15, testimony of Thomas Maurice, at p. 200; Volume 16, testimony of Reginald Walter Freeman, at pp. 95 & 108.

Adrian Gonzales testified that, as he exited Sylvia Montenegro's home on the morning of the murder and was crossing the street, someone on a bicycle "flew" by him and he only saw that the person on the bike was a male with black hair, wearing a white shirt and khaki pants. S.F. Trial, Volume 16, testimony of Adrian Gonzales, at pp. 191–93.

**22.** Id., Volume 17, testimony of Luis Salazar, at pp. 58–60. Petitioner also admitted he wanted to have sexual intercourse with Martha Sanchez. Id., testimony of Luis Salazar, at p. 99.

Martha's husband testified: (1) petitioner made a pass at Martha, (2) she rebuffed it, (3) when he confronted petitioner, the petitioner denied making the pass, (4) he told petitioner to stay away from his house, and (5) thereafter, Martha was terrified of petitioner. S.F. Trial, Volume 15, testimony of Oscar D. Ochoa, at pp. 51–53 & 55. Martha's niece testified: (1) when petitioner was Martha's neighbor, Martha often called her and asked her to come over and stay with her and the children when Martha's husband was working because Martha was afraid of petitioner, (2) Martha never had an affair with petitioner, (3) at one point, Martha completely stopped speaking to petitioner, and (4) once petitioner and his family moved out, about a month and a half before the murder, Martha stopped asking her to come over at night.

told his wife that violence made him feel good and he had thought about killing people.[23]

## 2. The Detached Phone Lines

The prosecution offered uncontested testimony from Martha's husband that (1) at approximately 12:30 a.m. on the date of the murder he had telephoned Martha from his place of employment and the phone had worked perfectly but (2) the day after the murder, when he returned to remove items from the home, the phone was not working and (3) he noticed that both of the telephone lines leading into the house from a box in the back of the house had been cut or pulled loose.[24] One of Martha's neighbors also testified that both the phone lines at the back of Martha's house had been cut.[25] A San Antonio Police Officer testified that on October 12, 1997, he observed and photographed the telephone lines hanging loose at the rear of the house where he also observed and photographed a pair of footprints in the mud directly below the window into Martha's bedroom.[26] The prosecution also presented testimony and photographs showing the exterior fronts of the victim's house and petitioner's former residence next door were completely dissimilar.[27]

## 3. The Verdict

On September 11, 1998, the jury returned its verdict, finding petitioner guilty of capital murder as charged in the indictment.[28]

## D. Punishment Phase of Trial

The punishment phase of petitioner's trial commenced on September 21, 1998.

### 1. The Prosecution's Evidence

A retired San Antonio Police Officer testified about a series of armed robberies of convenience stores in South San Antonio that occurred over a three-to-four-day period in late-January through early-February, 1988 involving the same vehicle.[29] A

---

*Id.*, Volume 15, testimony of Nicole Ponce, at pp. 58–68. Martha's mother testified in rebuttal that a couple months before petitioner and his family moved away, Martha had telephoned her very upset and frightened about petitioner's advance toward her. *Id.*, Volume 17, testimony of Gloria Rodriguez, at pp. 111–15.

**23.** S.F. Trial, Volume 17, testimony of Luis Salazar, at p. 99.

**24.** S.F. Trial, Volume 15, testimony of Oscar D. Ochoa, at pp. 32–34 & 43–44. Danny Ochoa also testified that he never had the phone lines repaired or re-connected because he moved out shortly after the murder. *Id.*, testimony of Oscar D. Ochoa, at p. 44.

**25.** S.F. Trial, Volume 15, testimony of Josie Garcia, at pp. 127–28.

**26.** S.F. Trial, Volume 16, testimony of Reginald Walter Freeman, at pp. 105–07.

**27.** More specifically, State Exhibit nos. 5 & 6, photographs of the victims' residence, showed the house at 250 Future was dark green in color with a front entry way and front door that were parallel to the street. S.F. Trial, Volume 15, testimony of Oscar D. Ochoa, at pp. 27–29. In contrast, State Exhibit no. 17, a photograph of petitioner's former residence at 254 Future, showed that house was light in color and had a protruding front porch with a front door that was perpendicular to the street. S.F. Trial, Volume 15, testimony of Frank Martinez, at p. 93. Petitioner admitted his former residence was not the same color as the victims' house. S.F. Trial, Volume 17, testimony of Luis Salazar, at p. 88.

Copies of all the relevant photographs appear in the exhibit volume from trial, i.e., S.F. Trial, Volume 24. Even a cursory review of those photographs reveals the front windows of the two residences were completely different.

**28.** Trial Transcript, Volume II of II, at p. 162; S.F. Trial, Volume 18, at pp. 51–53.

**29.** More specifically, a retired San Antonio Police Officer testified there were a series of eight-to-ten armed robberies of convenience

convenience store employee testified he was robbed at gun point on January 31, 1988, by a ski-masked robber whom he saw remove his ski-mask as the robber left the store and whom he later identified in a photo array as the petitioner.[30] Several San Antonio Police Officers testified regarding three armed robberies that oc- curred in rapid succession on February 2, 1988, and culminated in a high speed chase which ended only when the suspect vehicle went out of control at a construction site, spun out, and struck a utility pole.[31] The prosecution also presented testimony from a pair of eyewitnesses to two of the armed robberies on February 2, 1988, during one

stores in Southwest San Antonio over a three-to-four day period in early-February, 1988, involving the same vehicle culminating with a high-speed chase involving that vehicle, i.e., a gray and maroon station wagon. S.F. Trial, Volume 19, testimony of Roy Thomas, at pp. 147–49.

**30.** More specifically, the store clerk testified: (1) at approximately 7 a.m. on January 31, 1988, a robber wearing a ski-mask and armed with a revolver entered his store and demanded he come to the counter and give him all the money, (2) when the clerk complied, the robber said he needed the money to pay bills, (3) the robber directed him to get down behind the counter, (4) when the clerk raised up shortly thereafter, he observed the robber remove his ski-mask, (5) the robber spotted the clerk and yelled "Goddammit, get down," (6) the clerk complied but nonetheless saw the robber get into a station wagon with another person, and (7) the clerk later picked petitioner's photograph out of a photo array. S.F. Trial, Volume 19, testimony of Adolph Horace Hebert, III, at pp. 78–85.

**31.** More specifically, a San Antonio Police Officer testified that on February 2, 1988:(1) three armed robberies of convenience stores occurred in fairly rapid succession in Southwest San Antonio, the first at Marbach and Military, the second at Medina Base Road and Loop 410, and the third at Ray Ellison Drive and Apple Valley, (2) he was the first officer to spot the suspect vehicle seen fleeing all three robberies, (3) when he attempted to pull the suspect vehicle over after it ran a stop sign, the station wagon initially slowed down as if it were going to pull over but, when he slowed his vehicle, the station wagon took off at a high rate of speed, (4) a high speed chase ensued, involving several police vehicles, (5) when the station wagon approached a construction site, he called back the pursuers, (6) the station wagon then had an accident, spinning out, striking a utility pole at the con-struction site, and coming to a stop, (6) one of the two occupants of the station wagon was thrown clear of the station wagon, (7) the other occupant of the station wagon, whom he identified as petitioner, initially ignored several orders to exit the damaged station wagon, (8) eventually petitioner did exit the vehicle and both suspects were arrested and given their *Miranda* warnings at the scene, (9) petitioner had 16 live rounds of .38 caliber ammunition in his pockets, (10) a police radio scanner, a ski mask, and a realistic toy gun were found inside the station wagon, and (11) at the police station, in response to observing the officer's bullet-proof vest, the petitioner volunteered he was going to shoot the officer if he had walked up to the station wagon at the point where the station wagon almost stopped prior to the chase. S.F. Trial, Volume 19, testimony of Richard Rodriguez, at pp. 112–37.

Another San Antonio Police Officer testified he discovered a fully loaded and cocked .38 revolver with scratches on it and gravel in it approximately 75 feet from the spot where the station wagon came to rest after striking utility pole. *Id.*, Volume 19, testimony of Roy Thomas, at pp. 150–53.

Another San Antonio Police Officer testified that, on the date in question: (1) he responded to dispatches regarding the armed robberies, participated in the high speed chase, attempted unsuccessfully to block the station wagon at an intersection, and arrived at the scene of the accident as the petitioner was climbing out of the station wagon, (2) he covered the suspects while another officer placed them in handcuffs, (3) he transported the other suspect, whom he identified as petitioner's brother Dionicio, to the hospital, (4) during transit, Dionicio said he was only the driver, and (5) he observed the discovery of the .38 revolver at the accident scene. *Id.*, Volume 19, testimony of Steve John Lancaster, at pp. 138–44.

of which petitioner failed to wear his ski mask.[32] Photographs of the heavily-damaged station wagon, both the petitioner and his accomplice-brother at the scene of the wreck, and various items found inside the station wagon were also admitted into evidence.[33] Petitioner was indicted on four counts of aggravated robbery arising from the robberies on January 31 and February 2, 1988, entered guilty pleas to all four charges, and received deferred adjudication probation.[34]

The prosecution also presented testimony from a mentally challenged young woman and others that, on May 17, 1991, the petitioner picked up the young woman, who was then an 18–year–old high school student, from her high school on the pretext of taking her to lunch, drove her to his home, and sexually assaulted her.[35] Peti-

**32.** More specifically, a convenience store patron who arrived at the store located at Marbach Road and Military Highway testified: (1) he observed a ski-masked robber armed with a gun enter the store, (2) the robber pointed the gun at him and directed him to give him his money, (3) he did so, tossing an envelope containing his cash on the floor at the robber's feet, (4) the robber then turned to the store clerk and demanded money from the cash register and also directed the clerk to get the money that was under the tray, (5) the gunman was dressed in jeans, a black jacket, and a ski mask, (6) the gunman did not take the envelope that was on the floor as he fled the store, (7) the police arrived shortly thereafter but soon left when a call about another robbery came in, and (8) he later identified petitioner from the gunman's clothing and hair. S.F. Trial, Volume 19, testimony of Rogelio Rogerio, Jr., at pp. 89–96.

Another witnesses testified: (1) she pulled into the parking lot of the convenience store at Medina Base Road and Loop 410 on the date in question, (2) she observed a man inside the store holding a gun on the store clerk, (3) the gunman turned, faced her, and pointed his gun at her, (4) she put her car in reverse and quickly left, driving a considerable distance across town before she stopped at another convenience store and reported what she had seen, and (5) she later returned to the Medina Road store and identified the petitioner, who had worn no mask, as the robber she had seen earlier that date. *Id.*, Volume 19, testimony of Cheryl Dellinger, at pp. 107–11.

**33.** The photographs in question were attached as SX19 through SX21 to State Exhibit no. 109 and are contained in S.F. Trial, Volume 24.

**34.** More specifically, petitioner was indicted in cause no. 88–CR–1520 on a single count of aggravated robbery arising from the armed robbery on January 31, 1988, pleaded guilty to that charge on December 5, 1988, and received deferred adjudication probation on April 27, 1989. S.F. Trial, Volume 19, testimony of Beatrice Gonzales, at pp. 12–13 & 19; State Exhibit nos. 113–16, found in S.F. Trial, Volume 24.

Petitioner was also indicted in cause no. 88–CR–1519–B on three counts of aggravated robbery arising from the three armed robberies on February 2, 1988, pleaded guilty to all three charges on December 5, 1988, and received deferred adjudication probation. S.F. Trial, Volume 19, testimony of Beatrice Gonzales, at pp. 13 & 18–19; State Exhibit nos. 109–12, found in S.F. Trial, Volume 24.

A Bexar County probation officer testified: (1) he prepared the pre-sentence investigative report in connection with petitioner's robbery cases, (2) he had recommended against awarding petitioner probation but the trial court disregarded his recommendation, and (3) during his pre-sentence interview, the petitioner never mentioned he had been beaten or abused by his father and petitioner denied having any drug or alcohol problems. S.F. Trial, Volume 19, testimony of Rodney Reese, at pp. 31–39.

**35.** More specifically, petitioner's victim, Laura Guzman, testified during the punishment phase of petitioner's trial that, on the date in question: (1) her special education class was scheduled to take an afternoon field trip to the River Center Mall, (2) petitioner telephoned her the night before the field trip and urged her to go out to eat with him instead, (3) after arriving at school on the bus, she and a friend named Ramona departed the school in petitioner's vehicle, (4) instead of taking them out to eat, petitioner drove them to his home, (5) once they arrived at petitioner's

tioner was indicted in cause no. 92–CR–0445 on a charge of sexual assault but, on April 11, 1994, entered a guilty plea to a lesser-included charge of misdemeanor assault with bodily injury and received a two-year, probated sentence.[36]

A San Antonio Police Bike Officer testified: (1) he believed it would be very difficult to ride a bicycle from the location of Martha Sanchez's murder at 250 Future to petitioner's residence at 122 Ashland if one were intoxicated and (2) it would be extremely difficult to do so if one were intoxicated and it was still dark.[37] The neighbor of Martha Sanchez, who had custody of Brianna the morning of the murder, testified: (1) Brianna had blood on her face, hands, leg, and pajamas and (2)

Brianna told her "Bad man hurt Mommie" and "Mommie has lots of owies" while Brianna gestured and forced her leg into the neighbor's stomach to illustrate what had happened.[38] Martha's mother testified: (1) Martha's death had gravely affected their family, (2) since Martha's murder, Brianna often begged to be held at night, and (3) both Brianna and Erick had experienced bad dreams since their mother's murder.[39] A clinical psychologist who had examined and treated Erick since his mother's murder testified: (1) she felt strongly that Erick needed psychological assistance and (2) since the loss of his mother, Erick had been separated from his sister and brother and felt great sadness and anger.[40]

home, he asked her if she wanted to play pool, (6) when she declined, he led her to his bedroom to watch videos, (7) meanwhile, Ramona went to the store with petitioner's friend Arturo despite Laura's requests she stay at the house, (8) after Laura and the petitioner watched videos for a few minutes the petitioner asked Laura if she wanted to "do anything" with him, (9) when Laura informed the petitioner she did not wish to do so, he pushed her down on the bed and took off his clothes, (10) when she refused to undress as he directed, the petitioner removed Laura's clothing, (11) the petitioner then forced her to have sex with him, (12) he climbed on top of her and penetrated her while she offered no further resistance, (13) after they put their clothes back on, the petitioner drove Laura back to her school, (14) Laura went to the school cafeteria where workers summoned the principal, who took Laura to the office and called the police, and (15) Laura had no sexual experience prior to the incident in question. S.F. Trial, Volume 19, testimony of Laura Guzman, at pp. 48–61.

Laura's mother testified: (1) Laura had never skipped school prior to the incident in question, (2) when Laura arrived home, her clothing was rumpled and her makeup smeared, (3) when Laura told her what had happened, she telephoned the police, (4) she took Laura to the emergency room, and (5) later that date, Laura identified petitioner as her attacker for police. S.F. Trial, Volu8me

19, testimony of Antonia R. Guzman, at pp. 61–68.

A San Antonio Police Officer testified that, on the date in question: (1) he received a dispatch regarding a missing person, i.e., Laura, (2) he returned to the Guzman home later that same day where Laura gave him petitioner's name, (3) he telephoned petitioner, went to petitioner's residence, and placed petitioner under arrest, and (4) he then took petitioner to another location, where Laura identified petitioner as her assailant. *Id.*, Volume 19, testimony of Richard Hernandez, at pp. 69–74.

**36.** Certified copies of the documentation concerning the police investigation into petitioner's rape of Laura Guzman and the disposition of the criminal charge against petitioner arising therefrom were admitted into evidence during the punishment phase of petitioner's trial as State Exhibit nos. 119 & 120 and appear in S.F. Trial, Volume 24.

**37.** S.F. Trial, Volume 19, testimony of James Flores, at pp. 162–63.

**38.** *Id.*, Volume 19, testimony of Josie Garcia, at pp. 165 & 170.

**39.** *Id.*, Volume 19, testimony of Gloria Rodriguez, at pp. 178–81.

**40.** *Id.*, Volume 19, testimony of Joanne Murphy, at pp. 182–84.

## 2. The Defense's Evidence

A long-time friend of petitioner's family testified: (1) petitioner's father was extremely violent, very possessive, beat petitioner's mother, abused petitioner and his siblings, became extremely violent when drunk, but nonetheless was a hard worker, a responsible and loving father, and a good musician who provided for his family, (2) petitioner and his brother committed their armed robberies because their father was ill and unable to work and they needed money to pay the bills, (3) petitioner's family was very close-knit and would rather steal than borrow money when they needed to pay their bills, and (4) he was unaware of petitioner's sexual assault upon a mentally retarded girl.[41]

Petitioner's younger sister testified: (1) there was a lot of alcoholism and drug abuse in their family, (2) their father played in a band and taught his children to play, often abusing them in the process, hitting the boys when they didn't play their instruments right, (3) their father often struck them with a piece of garden hose and also abused their mother, (4) at age six months, a doctor told their mother that petitioner would always be slow, (5) petitioner had always been helpful to her and her family, loaning her money and helping to work on her car, (6) petitioner and his brother committed their robberies to pay the phone bill because their father was on a life-support machine, (7) petitioner is devoted to his three children, (8) petitioner had a difficult time holding a job, (9) petitioner never cried when their father beat him, (10) Martha Sanchez was not terrified of petitioner but permitted petitioner to baby-sit her children, (11)

their father taught them to defend themselves, and (12) she was unaware the petitioner had refused to participate in drug-treatment programs offered by the Bexar County Adult Probation Department.[42]

Petitioner's younger brother testified: (1) their father was abusive and they all had a difficult childhood, (2) their father would beat then until they bled but petitioner would never cry, (3) their father played in a band, drank when he played, and became violent with them when he drank, (4) all of the children in their family wanted out of their home as quickly as possible because of their father's abuse, (5) their mother is disabled due to back problems but is a loving person who always tries to help others, (6) petitioner is loving toward their mother, gets along with their siblings, and helped out his family when they were living out of a truck, (7) petitioner had difficulties in school because he and his brothers were often up late playing in the family band their father led, (8) their father kept all the money the children earned playing in the family band, (9) their father often slapped their mother and would slap his sons when they rushed to defend their mother, both of which happened almost every weekend, (10) he never witnessed any problems between petitioner and Martha Sanchez, and (11) drugs were a problem for petitioner but he is nonetheless a good person who loves his children and family.[43]

## 3. Rebuttal

The prosecution called Martha Sanchez's husband who testified: (1) he had never left his children in petitioner's care and (2)

---

41. S.F. Trial, Volume 20, testimony of Henry Cepeda, at pp. 5–14.

42. S.F. Trial, Volume 20, testimony of Sylvia Salazar, at pp. 15–25.

43. *Id.*, Volume 20, testimony of Daniel Salazar, at pp. 26–34.

Sylvia Montenegro and her daughter were his and Martha's baby-sitters.[44]

### 4. The Verdict

On September 24, 1998, the jury returned its verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a life sentence for petitioner.[45]

Accordingly, the trial court sentenced petitioner to death.

### E. Direct Appeal

On March 3, 2000, petitioner filed his brief appealing his conviction and sentence.[46] In an unpublished opinion issued April 24, 2001, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence.[47] Petitioner did not thereafter file a petition for writ of certiorari seeking further review of his conviction and sentence by the United States Supreme Court.

### F. State Habeas Corpus Proceeding '

On October 25, 2000, petitioner filed an application for state habeas corpus relief.[48]

---

**44.** S.F. Trial, Volume 20, testimony of Daniel Ochoa, at p. 36.

**45.** Trial Transcript, Volume II of II, at pp. 202–03; S.F. Trial, Volume 22, at pp. 3–6.

**46.** In twenty points of error in his appellant's brief, petitioner argued: (1) there was legally insufficient evidence of burglary, (2) there was factually insufficient evidence of petitioner's intent to commit sexual assault, (3) the trial court erred in admitting various oral statements petitioner made while in custody, (4) the trial court erred in refusing to instruct the jury at the punishment phase of trial that it could consider victim impact testimony only with regard to the mitigation special issue and not in connection with the future dangerousness issue, (5) the trial court erred when it denied petitioner's challenges for cause to venire members Frances Madrigal, Sandra L. Carter, Adam Quintero, Maria Barron Perez, and Belinda Flores Rivera, (6) the trial court erred in failing to supply adequate definitions of various key terms used in the punishment phase jury instructions, (7) Articles 44.251(a) and 37.071, § 2(e) of the Texas Code of Criminal Procedure are collectively unconstitutional because they do not adequately define the term "mitigating" and do not afford meaningful appellate review of the jury's answer to the Penry special issue, i.e., the mitigation special issue, (8) Due process requires proportionality review of the petitioner's death sentence, (9) the Texas statute's definition of "mitigating" is unconstitutional-

ly narrow, (10) the Penry special issue fails to place the burden of proof on the prosecution, (11) petitioner's constitutional rights were violated when the trial court failed to inform the jury of the impact of a single hold-out juror at the punishment phase of trial, (12) the Penry special issue is facially unconstitutional because it furnishes the jury open-ended discretion to impose or withhold the death penalty, (13) the multiple capital sentencing schemes employed in Texas in recent years renders petitioner's death sentence arbitrary and a violation of Equal Protection principles, (14) the Texas capital sentencing scheme is unconstitutional as administered, (15) the Texas capital sentencing scheme violates the Texas Constitution, and (16) there is racial discrimination in the administration of capital sentencing in Texas.

**47.** Salazar v. State, No. 73.282 (Tex.Crim.App. April 25, 2001).

**48.** As grounds for state habeas relief, petitioner argued: (1) his constitutional right to have his grand jury drawn from a fair cross-section of the community was violated because the grand jury that indicted him was drawn solely from a list of registered voters, (2) his trial counsel rendered ineffective assistance by failing to (a) move for the disqualification of an ineligible petit juror, (b) investigate and present evidence showing the telephone lines at 250 Future had never been reported cut and

On December 18, 2001, petitioner filed a supplemental state habeas corpus application in which he argued his state appellate counsel had rendered ineffective assistance by failing to timely notify petitioner of the disposition of petitioner's direct appeal by the Texas Court of Criminal Appeals so as to permit petitioner to seek review of his conviction and sentence on direct appeal by the United States Supreme Court.[49]

On May 14, 2002, the state trial court held an evidentiary hearing in petitioner's state habeas corpus proceeding. At that hearing, a Southwestern Bell employee testified that company had never received any reports of an inoperable or damaged telephone line at 250 Future after September 9, 1997.[50] A pathologist (1) testified that, based on his review of autopsy photographs and autopsy records, one of the abrasions on Martha Sanchez's thigh showed sufficient inflammation suggesting that it was from an injury that occurred more than a few minutes before her death, (2) testified there was no evidence Martha Sanchez had been sexually assaulted, (3) testified that he did not believe the pattern of Martha Sanchez's injuries fit an attempted rape, but (4) admitted that pathol-

ogy alone cannot validate or invalidate a theory of attempted sexual assault.[51]

Petitioner's former lead trial and appellate counsel testified at the same hearing: (1) at the time of petitioner's trial, there was no independent source of information on a potential juror's criminal history readily available, (2) nothing in venire member Clarita Gonzales' criminal history information, furnished by the prosecution or juror questionnaire answers, suggested to him that she had been convicted of theft, (3) Ms. Gonzales' questionnaire answers caused him to view her favorably as a potential juror, (4) he was surprised by the testimony of prosecution witnesses that the phone lines had been cut at the residence of Martha Sanchez despite the fact that crime scene photographs did show the lines had been pulled out or cut, (5) he sent his investigator to the phone company to get service records for that address, (6) he was also surprised by the medical examiner's testimony suggesting Martha Sanchez's injuries were consistent with attempted sexual assault, (7) he did not request appointment of a pathologist to assist the defense because there was no dispute as to the cause of death, (8) he usually requests an instruction directing

had never been repaired, (c) present expert testimony controverting the medical examiner's opinion that Martha Sanchez's injuries showed a pattern consistent with attempted sexual assault, (d) request a jury instruction at the guilt-innocence phase of trial requiring the jury to reach a unanimous verdict regarding a specific theory of capital murder, (e) object to the admission of victim-impact evidence at the guilt-innocence phase of trial and (f) object on unspecified grounds to prosecutorial argument that referenced victim-impact testimony, (3) the trial court fundamentally erred in failing to instruct the jury at the guilt-innocence phase of trial it was required to reach a unanimous verdict with regard to a specific theory of capital murder before it could return a "guilty" verdict, and (4) the Texas capital murder scheme's "aggravating

factors" are unconstitutionally vague. State Habeas Transcript, at pp. 1–54.

49. State Habeas Transcript, at pp. 251–53.

50. Statement of Facts from petitioner's state habeas corpus hearing (henceforth "S.F. State Habeas Hearing"), Volume 1 of 2, testimony of Richard Parr, at pp. 10–17. On cross-examination, however, Mr. Parr admitted he was unaware whether anyone had resided at 250 Future following the date of Martha Sanchez's murder and there could be any number of reasons why no service call had been made to that location following her murder. *Id.*, at p. 16.

51. S.F. State Habeas Hearing, Volume 1 of 2, testimony of Paul Radelat, at pp. 18–31.

the jury to reach a unanimous verdict regarding a particular theory of capital murder but did not do so in this case, (9) he was unaware of any legal basis to exclude testimony regarding the impact of the murder on the victim's children because the children had witnessed the murder, and (10) petitioner turned down a plea bargain offer for a life sentence despite his efforts to urge petitioner to accept same.[52]

The lead prosecutor at petitioner's trial testified: (1) he maintained an open file policy in connection with petitioner's trial, (2) he learned from a member of Martha's family during trial preparations that the phone lines to the residence had been cut, (3) that information was not included in any police reports, (4) neither Clarita Gonzales' juror questionnaire answers nor her voir dire answers revealed she had been convicted of theft, and (5) he went to 250 Future in the spring or summer of 1998 and observed the victim's family had moved out.[53]

The parties also stipulated to the admission of testimony and documentary evidence that had been introduced in a previous state habeas corpus proceeding challenging the manner in which grand jurors were selected in Bexar County.[54]

On October 30, 2002, the state trial court issued an Order containing its findings of fact, conclusions of law, and recommendation that petitioner's state habeas corpus application be denied.[55] In an unpublished order issued February 12, 2003, the Texas Court of Criminal Appeals adopted the findings and conclusions of the state trial court and denied petitioner's state habeas corpus application.[56]

## G. Proceedings in this Court

On December 5, 2003, petitioner filed a petition for federal habeas corpus relief in this Court in which he re-urged the same five claims for relief he had included in his state habeas corpus pleadings. (Docket entry no. 6.) On February 9, 2004, respondent filed an original answer and motion for summary judgment. (Docket entry no. 7.) On May 20, 2005, petitioner filed a response to respondent's answer and motion for summary judgment and motion for factual development. (Docket entry no. 8/9.)

## II. AEDPA Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with

---

**52.** S.F. State Habeas Hearing, Volume 1 of 2, testimony of Richard Langlois, at pp. 31–59.

**53.** S.F. State Habeas Hearing, Volume 1 of 2, testimony of Bert Richardson, at pp. 60–68.

**54.** The record from that state habeas corpus proceeding is included in the records from petitioner's state habeas corpus proceeding as S.F. State Habeas Hearing, Volume 2 of 2.

In pertinent part, the testimony from that hearing, held in the case of a defendant named Dowdle, established it was not possible to ascertain the ethnicity of a Bexar County juror by examining that juror's surname alone. S.F. State Habeas Hearing, Volume 2 of 2, testimony of Mark Stevens, at pp. 20–21. Testimony from the Dowdle hearing also established that at the time of petitioner's indictment, lists of potential grand jurors in Bexar County were randomly selected by computer from voter registration lists. S.F. State Habeas Hearing, Volume 2 of 2, testimony of Curtis Dusck, at pp. 56–57.

**55.** State Habeas Transcript, at pp. 256–80.

**56.** *Ex parte Luis Salazar,* App. No. 54,340–01 (Tex.Crim.App. February 12, 2003).

any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, *per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *see Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, ——, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *See Morrow v. Dretke*, 367 F.3d 309, 315

(5th Cir.2004)("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.'"), *cert. denied,* —— U.S. ——, 125 S.Ct. 421, 160 L.Ed.2d 325 (2004); *Pondexter v. Dretke,* 346 F.3d 142, 146, 149 (5th Cir.2003) (holding that, pursuant to § 2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir.2003)(holding the same), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); 28 U.S.C. § 2254(e)(1).

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Pondexter v. Dretke,* 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) *(en banc )* (holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537

U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. *Grand Jury Composition*

#### A. *The Claims*

In his first claim for federal habeas corpus relief herein, petitioner argues that his constitutional right to indictment by a grand jury drawn from a fair cross-section of the community and his equal protection rights were violated when he was indicted by a Bexar County grand jury drawn exclusively from voter registration lists.[57]

#### B. *State Court Disposition*

Petitioner fairly presented this same claim to the state courts during his state habeas corpus proceeding.[58] The state habeas trial court (1) found petitioner had presented no evidence showing the ethnic composition of registered voters in Bexar County, Texas, (2) found petitioner failed to present any evidence showing the ethnic composition of any of the grand jury venires randomly selected by computer during the time period at issue, (3) found the manner by which names were drawn from the jury wheel in Bexar County was "totally race neutral," (4) found petitioner had raised his complaint about the composition of his grand jury for the first time in a post-conviction, collateral proceeding, (5) concluded petitioner procedurally defaulted on his complaint regarding the composition of his grand jury by failing to either raise that same complaint via pretrial motion or on direct appeal, (6) concluded petitioner had failed to carry his burden of showing the pools from which Bexar County grand juries were selected, in his case or any others during the same time frame, were not proportional to the composition of Bexar County as a whole, and (7) conclud-

---

**57.** Petitioner's Petition for Writ of Habeas Corpus, filed December 5, 2003, docket entry no. 6 (henceforth "Petition"), at pp. 10–24.

**58.** State Habeas Transcript, at pp. 10–24.

ed petitioner had failed to establish that any under-representation of an identified group occurred as a result of "systematic" discrimination.[59]

## C. *Procedural Default*

Respondent correctly points out petitioner has procedurally defaulted on his fair cross-section and equal protection challenges to the composition of his grand jury.

### 1. *General Principles*

■■■ Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal or (2) the petitioner fails to exhaust all available state remedies and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). However, such procedural defaults only bar federal habeas review when the state procedural rule that forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

■■■ The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual

prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992).

### 2. *Failure to File a Pretrial Motion to Quash*

In the course of petitioner's state habeas corpus proceeding, the trial court concluded petitioner had procedurally defaulted on his complaints regarding the composition of his grand jury by failing to present those claims in a pretrial motion to quash the indictment against him.[60] As far back as 1979, the Fifth Circuit recognized as *firmly established* principles of Texas law the rules that (1) a defendant must raise a challenge to the composition of the grand jury at the earliest point possible and (2) when it is not possible to do so sooner, such a challenge may be raised before trial by a motion to quash the indictment. *Rat-*

---

**59.** State Habeas Transcript, at pp. 263–66.

**60.** State Habeas Transcript, at p. 264.

*cliff v. Estelle,* 597 F.2d 474, 476 (5th Cir. 1979), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). Both before and after the Fifth Circuit's holding in *Ratcliff,* the Texas Court of Criminal Appeals has *regularly applied* these same principles. *See, e.g., Muniz v. State,* 672 S.W.2d 804, 807–08 (Tex.Crim.App.1984) (holding pursuant to Article 19.27 of the Texas Code of Criminal Procedure a grand jury array must be challenged at the first opportunity, which ordinarily means when the grand jury is impaneled, but, if that is impossible, the grand jury array may be attacked in a motion to quash the indictment made before trial commences); *Muniz v. State,* 573 S.W.2d 792, 796 (Tex. Crim.App.1978) (holding that, when a challenge to the grand jury upon empaneling is not possible, the array can be attacked in a motion to quash the indictment before trial commences and that if the defendant had an opportunity to challenge the array when it was impaneled but did not do so, he may not challenge it at a later date), *cert. denied,* 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 291 (1979).

■ Petitioner was arrested on the date of his offense, i.e., October 11, 1997. Counsel were appointed to represent petitioner on October 15 and 22, 1997.[61] The grand jury that returned the indictment against petitioner was impaneled in November, 1997.[62] Petitioner was represented by counsel and had an opportunity to challenge the grand jury array at the time it was impaneled. More significantly, petitioner had ample opportunity to challenge the grand jury array through a pretrial motion to quash the indictment. Thus, under firmly established, regularly applied, state procedural principles, petitioner's failure to challenge his grand jury array through a pretrial motion to quash precluded his subsequent challenges to same, made for the first time more than two years after his conviction. *See Ratcliff v. Estelle,* 597 F.2d at 476 (holding a Texas petitioner who waited almost two years after trial to raise the issue of grand jury composition procedurally defaulted on those claims); *Muniz v. State,* 573 S.W.2d at 796 (holding a defendant who was in custody and represented by counsel at the time his grand jury was impaneled but who filed no challenge to the array when it was impaneled and who waited until several months after the grand jury returned the indictment against him before filing his motion to quash failed to timely challenge the array).

3. *Failure to Raise Point of Error on Direct Appeal*

■ As the second basis for its conclusion that petitioner procedurally defaulted on his complaints regarding the composition of his grand jury, the state habeas trial court pointed out that petitioner had failed to raise a point of error on direct appeal presenting those challenges to his grand jury.[63] The Fifth Circuit has recognized that this same procedural default rule was "firmly established" for federal procedural default purposes not only before the date the Texas Court of Criminal Appeals disposed of petitioner's direct appeal (i.e., April 25, 2001) but also before the date petitioner filed his appellant's brief (i.e., March 3, 2000). *See Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir.2004)(holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex.Crim.App.1996), *modified* on motion for rehearing on Feb-

---

**61.** Trial Transcript, Volume I of II, at pp. 2 & 4.

**62.** Trial Transcript, Volume I of II, at p. 13.

**63.** State Habeas Transcript, at p. 264.

ruary 2, 1998, furnishes the foundation for this new state procedural rule), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001) (holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson,* 207 F.3d 232, 249 (5th Cir.2000)(holding a federal habeas petitioner procedurally defaulted on a fair cross-section complaint by failing to raise it in a direct appeal that became final in 1997), *cert. denied,* 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000). At the time petitioner filed his appellant's brief the law in Texas, as established on rehearing in *Ex parte Gardner,* required a convicted criminal defendant to present any and all claims then available as points of error on direct appeal. *Id.* For unknown reasons, petitioner's appellate counsel failed to assert petitioner's complaint regarding the composition of his grand jury as a point of error on direct appeal. Thus, petitioner has procedurally defaulted on this claim in this Court.

The Fifth Circuit recognizes a presumption that a state procedural rule is an adequate and independent basis for foreclosing federal habeas review and that the burden is on the petitioner to demonstrate otherwise, i.e., to show that a state procedural rule is not firmly established or regularly applied. *Johnson v. Cain,* 215 F.3d 489, 494 (5th Cir.2000); *Hughes v. Johnson,* 191 F.3d 607, 614 (5th Cir.1999), *cert. denied,* 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *Sones v. Hargett,* 61 F.3d 410, 416–17 (5th Cir.1995). Petitioner has made no effort to show that either of the two state procedural rules the state habeas court held barred review on the merits of petitioner's federal complaints about the composition of his grand jury

were not regularly applied in similar cases by the Texas Court of Criminal Appeals.

Thus, petitioner has twice procedurally defaulted on his *federal* complaints regarding the composition of his grand jury.

### 4. *Exceptions Inapplicable*

#### a. *State Court's Alternative Holding on the Merits Does Not Preclude a Finding of Procedural Default*

■ Petitioner argues that because the state habeas court *also* reached the merits of his fair cross-section and equal protection challenges to the composition of his grand jury, procedural default does not preclude federal habeas review of same. However, the Supreme Court has clearly held that a state court opinion, such as that issued by the trial court in petitioner's state habeas corpus proceeding, which plainly relies on a state procedural bar need not fear reaching the merits of a federal claim in an *alternative* holding. *See Harris v. Reed,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10 ("By its very nature the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."). Furthermore, the Fifth Circuit expressly held in *Soria v. Johnson,* 207 F.3d at 249, that a state habeas court's finding of procedural default on a jury composition claim (based on the petitioner's failure to raise that claim on direct appeal) foreclosed federal habeas review of that claim even though the state habeas court alternatively rejected the petitioner's federal claim on the merits. Thus, the fact the state habeas court also addressed the merits of petitioner's fair cross-section and equal protection claims after plainly and clearly rejecting those same claims on state procedural grounds does not alter the preclusive effect of that court's state

procedural rulings. *Soria v. Johnson*, 207 F.3d at 249 n. 24 ("A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claims")(quoting *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir.1999)).

### b. *No "Cause and Actual Prejudice"*

■ To establish "cause" for purposes of the "cause and actual prejudice" exception to the procedural default doctrine, a petitioner must show either that some objective external factor impeded his counsel's ability to comply with the state's procedural rules or that his trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645. A showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645. Petitioner has presented this Court with allegations of ineffective assistance by his trial and appellate counsel. However, none of these assertions of ineffective assistance focus on the failure of his trial counsel to file a pretrial motion to quash the indictment against him or on the failure of his appellate counsel to challenge the composition of his grand jury on direct appeal. In sum, petitioner has alleged no specific facts showing his trial or appellate counsel rendered ineffective assistance when they failed to either file a pretrial motion to quash the indictment against petitioner or present a point of error on direct appeal challenging the composition of petitioner's grand jury. Petitioner also alleges no facts showing that external impediment precluded his trial or appellate counsel from timely filing a pretrial motion to quash the indictment against petitioner or including a point of error challenging the grand jury composition in petitioner's appellant's brief. Thus, petitioner has failed to allege any facts showing that he can satisfy the "cause and actual prejudice" exception to the procedural default doctrine.

### c. *No Fundamental Miscarriage of Justice*

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). Supreme Court precedent recognizes a subtle difference in the manner in which this test is applied at the guilt-innocence and punishment phases of a capital trial.

■ To satisfy the "factual innocence" standard at the *guilt-innocence phase* of a capital trial, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *See Sawyer v. Whitley*, 505 U.S. at 335–40, 112 S.Ct. at 2517–19 (holding that to show "actual innocence" in the context of a capital sentencing scheme, one must show by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state statute and that "factual innocence" means a fair probability that, in light of all the evidence, the trier of the facts would have entertained a reasonable doubt as to the defendant's guilt). In other words, to satisfy the "factual innocence" standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the

defendant's guilt. *Id.* The "factual innocence" test, therefore, requires the Court to give consideration to the all of the evidence now available to the Court on the issue of the petitioner's guilt or innocence. The defendant must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him. *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998).

The Supreme Court has held that a showing of "actual innocence" is made in connection with the *punishment phase* of a capital murder trial when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley,* 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* that this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523.

 Petitioner has alleged no specific facts sufficient to satisfy the factual innocence standard at either phase of his capital trial. The evidence of petitioner's guilt was overwhelming, especially when one views that evidence in the light most favorable to the jury's verdict, which implicitly rejected petitioner's proffered explanation for his offense. Likewise, petitioner has alleged no facts showing that, but for any identified constitutional error during his trial, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. Thus, petition-

er has failed to satisfy the fundamental miscarriage of justice exception to the procedural default doctrine.

### D. *No Merits*

#### 1. *State Court Disposition*

Alternatively, the state habeas court concluded petitioner had failed to carry his burden of showing that Bexar County's process for selecting his grand jury, or grand juries generally, either resulted in the under-representation of Hispanics on Bexar County grand juries or that any such under-representation was the result of systematic exclusion of Hispanics from grand jury service.[64] The state habeas court also concluded petitioner had failed to demonstrate that any under-representation of Hispanics on Bexar County grand juries was the product of intentional discrimination.[65]

#### 2. *Clearly Established Federal Law*

#### a. *Equal Protection and State Grand Jury Selection*

Few principles of federal constitutional law have been more consistently and uniformly applied over time than the Supreme Court's pronouncement in *Strauder v. West Virginia,* 100 U.S. 303, 307–10, 10 Otto 303, 25 L.Ed. 664 (1879), that excluding otherwise qualified persons from service on grand juries solely on the basis of their race violates the equal protection guarantee of the Fourteenth Amendment. *See Vasquez v. Hillery,* 474 U.S. 254, 261–62, 106 S.Ct. 617, 622–23, 88 L.Ed.2d 598 (1986) (recognizing that indictment of a criminal defendant by a grand jury from which members of a racial group purposefully have been excluded violates the defendant's right to equal protection of the

---

**64.** State Habeas Transcript, at p. 265.

**65.** State Habeas Transcript, at p. 266.

laws); *Rose v. Mitchell,* 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979) (because discrimination on the basis of race in selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a while," indictment by a grand jury from which members of a racial group purposefully have been excluded violates equal protection principles); *Castaneda v. Partida,* 430 U.S. 482, 492, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977) (it is a denial of equal protection to try a defendant under an indictment issued by a grand jury from which all persons of his race or color have, solely because of that race or color, been excluded by the State); *Alexander v. Louisiana,* 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972) ("For over 90 years, it has been established that a criminal conviction of a Negro cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which Negroes were excluded by reason of their race."); *Arnold v. North Carolina,* 376 U.S. 773, 774, 84 S.Ct. 1032, 1032, 12 L.Ed.2d 77 (1964); *Eubanks v. Louisiana,* 356 U.S. 584, 585, 78 S.Ct. 970, 972, 2 L.Ed.2d 991 (1958)("a criminal defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race."); *Reece v. Georgia,* 350 U.S. 85, 87, 76 S.Ct. 167, 169, 100 L.Ed. 77 (1955) ("The indictment of a defendant by a grand-jury from which members of his race have been systematically excluded is a denial of his right to equal protection of the laws."); *Hernandez v. Texas,* 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954) ("it is a denial of equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury, or before a petit jury, from which all persons of his race or color have, solely because of that race or color, been excluded by the State, whether acting through its legislature, its courts, or its executive or administrative officers."); *Cassell v. Texas,* 339 U.S. 282, 287, 70 S.Ct. 629, 632, 94 L.Ed. 839 (1950) (plurality held that a long practice of grand jury selection in which the number of Negroes who served was limited to a number (one) that was considered proportional to the overall percentage of Negroes in the county population was forbidden by equal protection principles); *Patton v. Mississippi,* 332 U.S. 463, 465, 68 S.Ct. 184, 186, 92 L.Ed. 76 (1947) (exclusion of Negroes from grand and petit juries because of their race denies Negro defendants their equal protection rights under the Fourteenth Amendment); *Hill v. Texas,* 316 U.S. 400, 404, 62 S.Ct. 1159, 1160, 86 L.Ed. 1559 (1942) (evidence showing the total exclusion of Negroes from grand and petit juries in a county for sixteen years constituted a prima face case of equal protection violation); *Smith v. Texas,* 311 U.S. 128, 129, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940) (the intentional and systematic exclusion of Negroes from grand jury service solely on account of race and color violated equal protection rights); *Pierre v. Louisiana,* 306 U.S. 354, 357, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1939) (exclusion from grand or petit jury service on account of race is forbidden by the Fourteenth Amendment); *Norris v. Alabama,* 294 U.S. 587, 589, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935) (holding that, regardless of whether the mechanism employed to achieve the result, i.e., be it statutory, judicial, or administrative, the total exclusion of all persons of the African race from service on grand juries violates equal protection); *Rogers v. Alabama,* 192 U.S. 226, 231, 24 S.Ct. 257, 259, 48 L.Ed. 417 (1904); *Carter v. Texas,* 177 U.S. 442, 447, 20 S.Ct. 687, 689, 44 L.Ed. 839 (1900); *Neal v. Delaware,* 103 U.S. 370, 396, 13 Otto 370, 26 L.Ed. 567 (1880).

In fact, invidious discrimination in the selection of grand jurors so undermines the structural integrity of the criminal tribunal that such claims are not amenable to harmless error analysis. *Vasquez v. Hillery,* 474 U.S. at 263–64, 106 S.Ct. at 623 (plurality holding of four Justices). A majority of the Supreme Court has held the rule in *Strauder* and its progeny is so fundamental that the rule and reasoning of *Stone v. Powell* does not foreclose federal habeas review of such claims. *Rose v. Mitchell,* 443 U.S. at 560–61, 99 S.Ct. at 3002.

■ To be entitled to federal habeas relief based on a claim of discriminatory selection of grand jurors, i.e., an equal protection violation, the petitioner must show the procedure employed "resulted in substantial under-representation" of the members of a race or another identifiable group. *Rose v. Mitchell,* 443 U.S. at 565, 99 S.Ct. at 3005; *Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280.

■ While the vast majority of the Supreme Court's opinions applying the equal protection principle first recognized in *Strauder* have addressed claims that members of a criminal defendant's racial or ethnic group were systematically and purposefully excluded from grand jury service, even a cursory examination of the Supreme Court's recent equal protection jurisprudence convinces this Court that standing to assert such an equal protection claim is not limited to members of the allegedly excluded group. *See Campbell v. Louisiana,* 523 U.S. 392, 400–01, 118 S.Ct. 1419, 1424–25, 140 L.Ed.2d 551 (1998) (holding that a white defendant had standing to complain about the alleged exclusion of blacks from his grand jury); *Powers v. Ohio,* 499 U.S. 400, 410–16, 111 S.Ct. 1364, 1370–74, 113 L.Ed.2d 411 (1991) (holding a criminal defendant could complain about the race-based exclusion of jurors effected

through peremptory challenges whether or not the defendant and the excluded jurors shared the same race). The test for determining whether this standard has been satisfied has four components.

First, the petitioner must establish the excluded group is a recognizable, distinct class singled out for different treatment under state law, as written, or as applied. *Rose v. Mitchell,* 443 U.S. at 565, 99 S.Ct. at 3005; *Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280. The Supreme Court's unanimous opinion in *Hernandez v. Texas* included an insightful discussion of the nature of this inquiry:

> Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time differences from the community norm may define other groups which need the same protection. *Whether such a group exists within a community is a question of fact.* When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.

*Hernandez v. Texas,* 347 U.S. at 478, 74 S.Ct. at 670 (emphasis added).

Second, the petitioner must establish the degree of under-representation was *substantial,* usually by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors over a significant period of time. *Rose v. Mitchell,* 443 U.S. at 565, 99 S.Ct. at 3005; *see Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280 ("This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a

method of proving discrimination in jury selection against a delineated class."). The Supreme Court's opinion in *Castaneda* cited *Hernandez v. Texas* as authority for the use of the exclusion method for proving discrimination. *Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280. In *Hernandez*, the Supreme Court faced a record establishing: (1) 14% of the county population were of Hispanic surnames, (2) 11% of the males over age 21 had such names, (3) 6 or 7 percent of the freeholders on the tax rolls were of Mexican descent, yet (4) for 25 years, there was no record of any Mexican–American citizen serving as members of a jury commission, grand jury, or petit jury. *Hernandez v. Texas*, 347 U.S. at 481, 74 S.Ct. at 672. Needless to say, the Supreme Court had no difficulty determining such a showing fulfilled the petitioner's duty to establish a *prima facie* case of discrimination. *Id.*, 347 U.S. at 481–82, 74 S.Ct. at 672. In so doing, the Supreme Court relied upon its holding in *Norris v. Alabama*, in which the Supreme Court faced another record showing the total exclusion of all Negroes from jury service despite ample evidence that such persons "constituted a substantial segment of the population of the jurisdiction" over an extended period of time, which also constituted prima facie proof of the systematic exclusion of Negroes from jury service. *Id.*, 347 U.S. at 480, 74 S.Ct. at 671. The record in *Norris* revealed: (1) the total county population was 36,881, (2) that total including 2,688 Negroes, (3) 666 Negro males were included among the county's 8,801 males over age 21, yet (4) no witness called to testify before the trial court, including several county officials responsible for supervising jury trials, could recall even a single Negro ever having served on a grand or petit jury in the county's history. *Norris v. Alabama*, 294 U.S. at 590–92, 55 S.Ct. at 580–81. The Supreme Court has held "substantial" the

following discrepancies: 79% of county population was Mexican–American but only 39% of such persons served as grand jurors over an 11–year period (*Castaneda v. Partida*, 430 U.S. at 495, 97 S.Ct. at 1280); 60% of population were Negroes but only 37% of grand jurors (*Turner v. Fouche*, 396 U.S. 346, 357, 90 S.Ct. 532, 539, 24 L.Ed.2d 567 (1970)); 27.1% of those on tax rolls were Negroes but only 9.1% of those on grand jury venires (*Whitus v. Georgia*, 385 U.S. 545, 550–51, 87 S.Ct. 643, 646–47, 17 L.Ed.2d 599 (1967)); 24.4% of tax lists but only 4.7% of grand jury lists (*Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967)); 19.7% of tax lists but only 5% of jury list (*Jones v. Georgia*, 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967)).

Third, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Rose v. Mitchell*, 443 U.S. at 565, 99 S.Ct. at 3005; *Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280. The Supreme Court has emphasized that selection procedures which offer ample opportunity for consideration of the race of potential grand jurors by those making the selection decision can combine with a showing of statistical divergence from the breakdown of the population to support a finding of discrimination. *See Alexander v. Louisiana*, 405 U.S. at 630–31, 92 S.Ct. at 1225 (pointing out: (1) the racial designation of potential jurors appeared on all questionnaires returned by them because different color cards were attached to the returned questionnaires for Negroes and Whites and (2) at two critical junctures in the selection process where disproportionate elimination of Negroes occurred, the racially identifying markers were visible to jury commissioners); *Avery v. Georgia*, 345 U.S. 559, 560–61, 73 S.Ct. 891, 892, 97 L.Ed. 1244

(1953) (juror cards of different color were prepared for Negroes and Whites from segregated tax lists and no Negroes had appeared on the final jury); *Whitus v. Georgia*, 385 U.S. at 548–49, 87 S.Ct. at 645–46 (all-white jury resulted from selection of jurors from a one-volume tax digest divided into separate sections for Negroes and Whites and black taxpayers had a "c" after their names and 42% of county population and 27% of taxpayers were Negro but only 9% of petitioner's jury venire).

■ Finally, once the foregoing prima facie case is established, the burden shifts to the State to rebut the prima facie case. *Rose v. Mitchell*, 443 U.S. at 565, 99 S.Ct. at 3005; *Castaneda v. Partida*, 430 U.S. at 495, 97 S.Ct. at 1280.

In the course of its equal protection opinions, the Supreme Court has taken care to point out the Fifth Amendment's provision for presentment or indictment by a grand jury has never been held obligatory for the States. *Alexander v. Louisiana*, 405 U.S. at 633, 92 S.Ct. at 1226–27.

### b. *Fair Cross–Section Requirement*

■ The Sixth Amendment guarantees a criminal defendant the right to have his or her jury chosen from a venire or panel representing a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527–30, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975). The Supreme Court reached its holding in *Taylor* by recognizing: (1) "the Sixth Amendment's provision for jury trial is made binding on the States by virtue of the Fourteenth Amendment" (*Taylor v. Louisiana*, 419 U.S. at 526, 95 S.Ct. at 696); (2) "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community" (*Id.*, 419 U.S. at 527, 95 S.Ct. at 696); (3) the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth

Amendment right to a jury trial (*Id.*, 419 U.S. at 528, 95 S.Ct. at 697). Interestingly, the Supreme Court cited its long line of equal protection cases outlawing the purposeful exclusion of racial and ethnic groups from service on grand and petit juries in support of its interpretation of the Sixth Amendment's fair cross-section requirements. The Supreme Court has acknowledged its holding in *Taylor* announced a new rule of constitutional criminal procedure. *Taylor v. Louisiana*, 419 U.S. at 535–36, 95 S.Ct. at 700 ("until today no case had squarely held that the exclusion of women from jury venires deprives a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community.").

The fair cross-section requirement exists separate and apart from either of the Equal Protection rights recognized in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), or in the long line of Supreme Court opinions discussed above in Section III.D.2.a. *See Holland v. Illinois*, 493 U.S. 474, 478–83, 110 S.Ct. 803, 806–08, 107 L.Ed.2d 905 (1990) (distinguishing the principles governing the Supreme Court's equal protection case law forbidding the systematic discriminatory exclusion of identifiable groups from grand juries and petit jury venires from the Sixth Amendment's fair cross-section of the community requirement and holding that the latter did not prohibit the use of peremptory challenges in an allegedly racially discriminatory manner akin to the Equal Protection Clause's prohibition recognized in *Batson* ).

The Supreme Court has repeatedly refused to extend the Sixth Amendment's fair cross-section requirement to the selection of a petit jury once a jury panel or venire has been constituted that satisfies this requirement. *See Holland v. Illinois,*

493 U.S. at 486–87, 110 S.Ct. at 810–11 (holding the Sixth Amendment's fair cross-section requirement does not mirror the Equal Protection Clause's proscription against racial discrimination in the exercise of peremptory challenges); *Teague v. Lane*, 489 U.S. at 314–15, 109 S.Ct. at 1077–78 (recognizing the denial of the right to a fair cross-section of the community in a jury venire does not undermine the fundamental fairness that must underlie a criminal conviction); *Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986) ("We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").

 A criminal defendant has standing to challenge an exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class. *Duren v. Missouri*, 439 U.S. 357, 359 n. 1, 99 S.Ct. 664, 666 n. 1, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana*, 419 U.S. at 526, 95 S.Ct. at 695–96. The Supreme Court has emphasized its construction of the Sixth Amendment does not deprive the States of the opportunity to grant exemptions from jury service in cases of special hardship or incapacity or to persons engaged in particular occupations whose uninterrupted performance of their duties is critical to the community's welfare. *See Taylor v. Louisiana*, 419 U.S. at 534, 95 S.Ct. at 700 ("States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare."); *Id.*, 419 U.S. at 538, 95 S.Ct. at 701 ("States remain free to prescribe rele-vant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community.").

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. at 364, 99 S.Ct. at 668.

3. *AEDPA Review*

a. *Equal Protection Claim*

As explained above, in order to establish a prima facie case of discrimination in the selection of grand jurors, the petitioner must: (1) establish the excluded group is a recognizable, distinct class singled out for different treatment under state law as written or as applied; (2) establish the degree of under-representation was *substantial;* and (3) show the selection procedure was susceptible of abuse or was not racially neutral. *Rose v. Mitchell*, 443 U.S. at 565, 99 S.Ct. at 3005; *Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280; *Rideau v. Whitley*, 237 F.3d 472, 485 (5th Cir.2000), *cert. denied sub nom. Cain v. Rideau*, 533 U.S. 924, 121 S.Ct. 2539, 150 L.Ed.2d 708 (2001); *James v. Whitley*, 39 F.3d 607, 609 (5th Cir.1994), *cert. denied*, 514 U.S. 1069, 115 S.Ct. 1704, 131 L.Ed.2d 565 (1995); *Johnson v. Puckett*, 929 F.2d 1067, 1071–72 (5th Cir.1991), *cert. denied*, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d

226 (1991); *Guice v. Fortenberry*, 661 F.2d 496, 499 (5th Cir.1981).

■ Petitioner alleges Hispanics made up (1) approximately 49.7 percent of Bexar County's total population in 1990 and (2) approximately 56.2 percent of the total Bexar County population in 1998.[66] He alleges further that approximately 34 percent of Bexar County grand jurors had Hispanic surnames during the period from 1990 through the first half of 1998.[67] The sum and substance of petitioner's *evidence* of the ethnicity of Bexar County grand jurors presented during petitioner's state habeas corpus proceeding consisted of an admittedly incomplete listing of Bexar County grand jurors during the time frame in question stating only the names, mailing addresses, and occupations of those grand jurors.[68] Nothing on the lists in question purports to identify the ethnicity of any of those persons. Instead, petitioner sought to rely exclusively on his own subjective perception of the "Hispanic" or "non-Hispanic" nature of the grand jurors' surnames as the exclusive determinant of their ethnicity.[69] However, unchallenged testimony from respected Bexar County attorney and law professor Mark Stevens established it was *not* possible to ascertain the ethnicity of grand jurors in Bexar County based solely upon the surnames of those persons.[70]

Nor was this the only deficiency in petitioner's proffered evidence regarding the ethnicity of persons relevant to petitioner's equal protection and fair cross-section claims. Petitioner's two pages of Bexar County Census data do not purport to establish the number or percentage of Hispanics among Bexar County's *adult* population. Petitioner's reliance on the percentages of Hispanics among Bexar County's total population during the relevant time period is misplaced. The systematic exclusion of persons under the age of 18 from grand jury service does not impinge upon any recognized federal right. Thus, the relevant universe of Hispanics for purposes of analyzing petitioner's equal protection and fair cross-section complaints is that portion of the Bexar County's *adult* population that are Hispanic. Petitioner presented the state habeas court with no hard data from which that court could calculate the Hispanic proportion of Bexar County's *adult* population.

**66.** Petition, at p. 12. Significantly, petitioner presented no documentary evidence to his state habeas court establishing the percentage of Hispanics among Bexar County's adult population at any point in time.

**67.** Petition, at p. 13. The state habeas court found "[t]he determination of an individual's ethnicity by means of surnames only is highly problematical." State Habeas Transcript, at p. 263.

**68.** Those incomplete lists appear as Exhibits attached to S.F. State Habeas Hearing, Volume 2 of 2.

**69.** Writing for this Court in a recent opinion addressing grand jury selection in Wilson and Atascosa Counties, District Judge Xavier Rodriguez referred to reliance on the surnames of individuals to determine their ethnicity as "an

extremely inexact factor in a state as ethnically diverse as Texas." *Pedro Solis Sosa v. Dretke*, No. SA–00–CA–0312–XR, 2004 WL 1124949, *35 n. 227 (W.D.Tex. May 20, 2004), *Certificate of Appealability denied*, 2005 WL 1287438 (5th Cir.2005). The "inexactness" of using surnames as the lone determinant of ethnicity is magnified greatly in a community as cosmopolitan as Bexar County. More significantly, petitioner offered the state habeas court, and offers this Court, no explanation of precisely what petitioner considers an "Hispanic" surname, as opposed to a non-Hispanic surname. Nor did petitioner offer the state habeas court any objective criteria which could be used to ascertain which surnames fell within petitioner's perception of the term "Hispanic."

**70.** S.F. State Habeas Hearing, Volume 2 of 2, testimony of Mark Stevens, at p. 20.

Nor did petitioner identify for the state habeas court any readily available statistical compilation of which the state habeas court could have taken judicial notice and made that calculation itself.

Under such circumstances, the state habeas court reasonably concluded petitioner had failed to establish Hispanics were *substantially* under-represented on Bexar County grand juries in relation to their percentage of that County's adult population.

Likewise, petitioner presented the state habeas court with no evidence establishing that Bexar County's decision to randomly draw grand jury venires from voter registration lists resulted in a system that was either susceptible of abuse or other than race-neutral. Petitioner presented the state habeas court with no evidence showing the ethnic composition of Bexar County's registered voters during the relevant time frame.[71] The state habeas court had before it no evidentiary basis from which to compare the percentage of Bexar County's *adult* population that was Hispanic with the percentage of Bexar County's Hispanic registered voters. In the absence of such statistical evidence, the state habeas court reasonably concluded petitioner had failed to show Bexar County's decision to randomly draw grand jury venires from voter registration lists was anything other than race-neutral.

For more than a quarter century, the Fifth Circuit has consistently rejected equal protection and fair cross-section complaints arising from alleged under-representation of various minority groups on voter registration lists used to select grand and petit jury venires. *See, e.g., Soria v. Johnson,* 207 F.3d at 249 ("the fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore underrepresented [sic] on jury panels presents no constitutional issue."), *quoting United States v. Brummitt,* 665 F.2d 521, 527 (5th Cir. 1981), *cert. denied,* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982), *in turn quoting United States v. Lopez,* 588 F.2d 450, 452 (5th Cir.1979), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 319 (1979), *in turn citing United States v. Arlt,* 567 F.2d 1295, 1297 (5th Cir.1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 412 (1978), *in turn citing United States v. Goff,* 509 F.2d 825, 826–27 (5th Cir.1975)(upholding the use of voter registration lists to select jurors), *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975).

The Supreme Court has never mandated precise ethnic or gender proportionality of representation in grand juries or grand jury panels. *See Rideau v. Whitley,* 237 F.3d at 487 ("The Supreme Court has stressed that it has never announced mathematical standards for the demonstration of 'systematic exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors.' ") *quoting Alexander v. Louisiana,* 405 U.S. at 630, 92 S.Ct. at 1225. Petitioner admits a substantial percentage of persons with Hispanic surnames (34%) served as Bexar County grand jurors during the time period to which petitioner focused the state habeas court's attention. Petitioner has alleged no specific facts, much less furnished any admissible evidence, showing Bexar County's reliance upon the random selection of grand jury venires from County voter registration lists was intended to result, or has resulted, in any under-representation of Hispanics on Bexar County grand jury venires vis-a-vis the percentage of Bexar County's *adult* population that is

---

71. State Habeas Transcript, at pp. 263–65.

Hispanic. Under such circumstances, petitioner's complaint that persons with Hispanic surnames made up only five of the twelve grand jurors who indicted him, unaccompanied by any fact-specific allegations of official discrimination against Hispanics in Bexar County, is insufficient to establish a prima facie case of discrimination against Hispanics in connection with the selection of the grand jury that returned his indictment. Therefore, insofar as petitioner complains about the alleged exclusion of Hispanics from his grand jury, petitioner's equal protection claim is without merit.[72]

Given the foregoing, the state habeas court's alternative rejection on the merits of petitioner's equal protection complaints about alleged discrimination against Hispanics in Bexar County grand jury selection was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### b. *Fair Cross–Section Claim*

#### (1) Teague *Foreclosure*

The initial problem with applying the Sixth Amendment's requirement that petit juries be drawn from jury venires or panels that represent a fair cross-section of the community is the Supreme Court has never applied this constitutional requirement to the selection process for state *grand* juries. On the contrary, as explained above, the Supreme Court has taken great care in recent years to limit the application of the fair-cross-section re-

quirement. Thus, insofar as petitioner argued before his state habeas court that the alleged under-representation of Hispanics on Bexar County *grand* juries violated the fair cross-section requirement, that argument is foreclosed by not only by the AEDPA but also by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

■ Federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994); *Teague v. Lane*, 489 U.S. at 310, 109 S.Ct. at 1075; *Daniel v. Cockrell*, 283 F.3d 697, 705 (5th Cir.2002)(recognizing that *Teague* held a federal court may not create or apply new constitutional rules on habeas review), *cert. denied*, 537 U.S. 874, 123 S.Ct. 286, 154 L.Ed.2d 126 (2002); *Jackson v. Johnson*, 217 F.3d 360, 363–64 (5th Cir.2000); *Murphy v. Johnson*, 205 F.3d 809, 817 (5th Cir.2000), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000); *Matthew v. Johnson*, 201 F.3d 353, 359 (5th Cir.2000), *cert. denied*, 531 U.S. 830, 121 S.Ct. 291, 148 L.Ed.2d 44 (2000). Absent compelling reasons to the contrary, a federal court should apply the holding in *Teague* even when it has been implicitly waived by the State. *Jackson v. Johnson*, 217 F.3d at 361–63. Under *Teague*, a "new rule" is one which was not dictated by precedent existing at the time the defendant's conviction became final. *O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or

---

72. Had petitioner's grand jury included one additional person with what petitioner characterizes as an "Hispanic" surname, the "ethnic" composition of petitioner's grand jury would have been a nearly perfect reflection of the ethnic composition of Bexar County as alleged by petitioner.

the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"); *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953 (holding the same); *Murphy v. Johnson,* 205 F.3d at 817; *Matthew v. Johnson,* 201 F.3d at 359 (holding the inquiry is whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule the defendant sought was required by the Constitution). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

■ The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953; *Jackson v. Johnson,* 217 F.3d at 363. This non-retroactivity doctrine applies equally to a novel application of an old rule. *Stringer v. Black,* 503 U.S. 222, 227–29, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992); *Butler v. McKellar,* 494 U.S. 407, 414–15, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990); *West v. Johnson,* 92 F.3d 1385, 1399 (5th Cir.1996), *cert. denied,* 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997).

■ The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for: (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973; *Graham v. Collins,* 506 U.S. 461, 478, 113 S.Ct. 892, 897–98, 122 L.Ed.2d 260 (1993); *Jackson v. Johnson,* 217 F.3d at 364. Neither of those two exceptions applies to petitioner's fair cross-section complaint regarding the composition of his *grand* jury.

■ A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *See Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."). Petitioner's conviction became final for *Teague* purposes not later than July 25, 2001, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence and the date the deadline for filing a petition for writ of certiorari on petitioner's behalf with the United States Supreme Court expired. *See Daniel v. Cockrell,* 283 F.3d at 705 (holding a Texas prisoner's conviction became final for *Teague* purposes ninety days after the

Texas Court of Criminal Appeals denied his petition for discretionary review); *Flanagan v. Johnson*, 154 F.3d 196, 197 (5th Cir.1998) (holding a Texas prisoner's criminal conviction became "final" on the ninetieth day after the Texas Court of Criminal Appeals issued its opinion, i.e., when the deadline for filing a certiorari petition with the United States Supreme Court expired).

In petitioner's case, the Texas Court of Criminal Appeals issued its opinion affirming his conviction and sentence on April 25, 2001. Petitioner cites no *Supreme Court* authority in existence as of the date ninety days thereafter which would have compelled reasonable jurists to apply the fair cross-section requirement to petitioner's complaints about the composition of his *grand* jury. Neither of the two exceptions to that doctrine recognized by the Supreme Court to date have any application to petitioner's fair cross-section complaint about the manner in which Bexar County selects grand jury venires.

### (2) *No Under–Representation or Systematic Exclusion*

▌ The Fifth Circuit has recognized an individual criminal defendant's right to select a petit jury from a venire or panel representative of a fair cross-section of the community serves a different interest than the broader equal protection guarantee violated by the exclusion of an identifiable group from grand jury service. *See Johnson v. Puckett*, 929 F.2d 1067, 1071 (5th Cir.1991)("The injury to equal protection caused by racial discrimination in the selection of members of a grand jury 'is not limited to the defendant—there is injury to the jury system, to the law as an institu-tion, to the community at large, and to the processes of our courts.' ")(*quoting Rose v. Mitchell*, 443 U.S. at 556, 99 S.Ct. at 3000, and *Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946)), *cert. denied*, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991). Nonetheless, despite the fact the Supreme Court has never applied the Sixth Amendment's fair cross-section requirement to the selection of a state *grand* jury, the Fifth Circuit has consistently done so for several decades. *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir.2000)("at the time Murphy's conviction became final [October 11, 1994], our precedent dictated that the fair cross-section requirement of the Sixth Amendment applied to the selection process for grand juries."), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000); *Atwell v. Blackburn*, 800 F.2d 502, 504–05 (5th Cir.1986), *cert. denied*, 480 U.S. 920, 107 S.Ct. 1378, 94 L.Ed.2d 692 (1987); *Ciudadanos Unidos De San Juan v. Hidalgo County Grand Jury Commissioners*, 622 F.2d 807, 825–26 (5th Cir. 1980)("the Constitution permits neither tokenism nor strict proportionalism but requires rather that the grand jurors be chosen from a 'fair cross section' of those eligible for grand jury service . . . ."), *cert. denied*, 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981); *Curry v. Estelle*, 524 F.2d 981, 983 (5th Cir.1975); *Brooks v. Beto*, 366 F.2d 1, 11–14 (5th Cir.1966), *cert. denied*, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967). *See also Brooks v. Beto*, 366 F.2d 1, 11 (5th Cir.1966) ("[I]t is a constitutional imperative that the jury, grand or petit, fairly represent the community."), *cert. denied*, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967).[73]

---

**73.** The Fifth Circuit's application of the Sixth Amendment's fair cross-section requirement to the selection of *grand* jurors may have resulted from the fact that many of the Supreme Court's equal protection opinions striking down racially discriminatory selection processes dealt with systems used to select both grand and petit jurors. Additionally, the

This Court must, therefore, determine whether the petitioner has established the following prima facie case: first, the group allegedly excluded from grand jury service in Bexar County was a "distinctive" group in that community; second, representation of this group on grand jury panels was not fair and reasonable in relation to the number of such persons in that community; and third, this under-representation was due to systematic exclusions of the group in the grand jury selection process. *Atwell v. Blackburn*, 800 F.2d at 505, *citing Duren v. Missouri*, 439 U.S. at 364, 99 S.Ct. at 668.

For the reasons discussed at length in Section III.D.3.a. above, petitioner has failed to establish a prima facie case of purposeful discrimination against Hispanics in the selection of Bexar County grand jury venires. Petitioner failed to present the state habeas court with any hard data establishing the percentage of Hispanics on Bexar County grand juror venires during the relevant time frame was substantially below the percentage of Hispanics in Bexar County's *adult* population. Nor did petitioner present the state habeas court with any evidence showing Bexar County's decision to randomly draw grand jury venires from lists of registered voters resulted in a systematic exclusion of Hispanics from grand jury service.

Accordingly, the state habeas court's alternative rejection on the merits of petitioner's fair cross-section complaints about alleged discrimination against Hispanics in Bexar County grand jury selection was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### IV. Guilt–Innocence Phase Jury Instructions

#### A. The Claim

In his third claim for federal habeas corpus relief, petitioner argues the state trial court "fundamentally erred" when it submitted the issue of petitioner's guilt to the jury without instructing the jury it was required to reach a unanimous verdict regarding the specific theory of capital murder before the jury could return a "guilty" verdict.[74]

#### B. State Court Disposition

In the course of petitioner's state habeas corpus proceeding, the state trial court concluded the submission of divergent theories of capital murder under a single

Fifth Circuit's opinion in *Brooks v. Beto*, which is the genesis of fair cross-section analysis via-a-vis grand juries in this Circuit, cited a number equal protection opinions issued by the Supreme Court, as well as several *dissenting* opinions written by Supreme Court Justices in those cases.

Neither of the two Supreme Court opinions cited by the Fifth Circuit in *Murphy v. Johnson* to support its application of Sixth Amendment fair cross-section principles to grand jury selection involved Sixth Amendment claims. More specifically, *Peters v. Kiff* stands only for the proposition that the Fourteenth Amendment's due process clause gives a criminal defendant standing to challenge

the exclusion of an identifiable group of persons from grand jury service regardless of whether the defendant is a member of that same group. *Smith v. Texas* was one of the many opinions issued by the Supreme Court striking down racially discriminatory grand jury selection on *equal protection* grounds. Neither of those two Supreme Court opinions, or any of the opinions cited by the Fifth Circuit in *Brooks v. Beto* involved Supreme Court application of the Sixth Amendment's fair cross-section requirement to state *grand* jury selection.

74. Petition, at pp. 50–51.

count of that offense did not violate the constitutional requirement of a unanimous verdict.[75]

## C. AEDPA Analysis

■ A majority of the Supreme Court rejected the argument implicit in petitioner's third claim herein in *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In *Schad,* a majority of the Supreme Court recognized the general rule that a single count may include allegations the defendant committed the offense by one or more specified means and held there is no constitutional requirement the jury reach unanimity on the preliminary factual issues which underlie the verdict. *See Schad v. Arizona,* 501 U.S. at 631–32, 111 S.Ct. at 2496–97 (plurality opinion of Justice Souter, Chief Justice Rehnquist, and Justices O'Connor and Kennedy); *Schad v. Arizona,* 501 U.S. at 649–50, 111 S.Ct. at 2506 (Justice Scalia's separate concurring opinion in which he specifically agreed with the plurality's determination the jury need not agree on the mode of commission of a single crime when that offense can be committed in various ways). If, as the Supreme Court majority held in *Schad,* there is no constitutional requirement that a capital murder jury reach unanimity with regard to any of several specific means by which such a crime may be committed when the indictment alleges multiple theories of the offense, then the premise underlying petitioner's argument vanishes. In *Schad,* as occurred in petitioner's case, the prosecution properly indicted petitioner on a single count of capital murder and alleged and attempted to prove several different factual theories by which petitioner could have committed that single offense. *Id.* Hence, petitioner's complaint the guilt-innocence phase jury charge did not instruct

his jury to render a "guilty" verdict only if the jury unanimously agreed on one of the two specific theories of the offense alleged in the indictment is *non sequitur.*

The Supreme Court's actual holding in *Schad* refutes, rather than supports, the legal premise underlying petitioner's third claim herein. It is not within the province of this Court to either disregard or overrule the Supreme Court majority's clear holding in *Schad.* The state trial court's guilt-innocence phase jury instructions fully complied with clearly established Supreme Court case law as set forth in the actual holdings of a majority of that court in *Schad.*

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaint regarding the lack of a unanimity directive in his guilt-innocence phase jury instructions was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## D. Teague Foreclosure

Furthermore, because the Supreme Court's opinions in *Schad* implicitly, if not explicitly, rejected the legal premise underlying petitioner's third claim herein, adoption of the rule advocated by petitioner in his third claim herein is foreclosed by the non-retroactivity principle of *Teague.*

## V. Punishment Phase Jury Instructions

## A. The Claim

In his fourth claim herein, petitioner complains the capital sentencing special

---

**75.** State Habeas Transcript, at pp. 276–77.

issues included in his punishment-phase jury charge included numerous "vague" terms which failed to channel the jury's discretion regarding the imposition of a life or death sentence and thereby violated the Eighth and Fourteenth Amendments.[76]

### B. State Court Disposition

In the course of petitioner's state habeas corpus proceeding, the state trial court concluded the Texas capital sentencing scheme performs the constitutionally mandated duty of narrowing the category of defendants eligible to receive the death penalty at the guilt-innocence phase of trial and, therefore, the Texas capital sentencing special issues constitutionally grant the jury great discretion with regard to whether to impose the death penalty at the punishment phase of trial.[77]

### C. AEDPA Analysis

#### 1. Texas Not a "Weighing" Jurisdiction

■■■ The initial problem with petitioner's fourth claim herein is petitioner's erroneous assumption the various terms included within his punishment-phase jury instructions constituted "aggravating factors" analogous to those employed by jurisdictions that require a capital sentencing authority to "weigh" identified aggravating factors against "mitigating" factors. Petitioner's jury was never faced with the type of weighing responsibility involved in many of the cases relied upon by petitioner in support of his fourth claim herein. Texas is not a weighing jurisdiction for Eighth Amendment purposes. *See Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir.1999)(holding that Texas is not a weighing state), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003,

145 L.Ed.2d 945 (2000); *West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir.1996)(rejecting the argument the Texas capital sentencing special issues work as aggravating factors and, therefore, require detailed definitions of the terms employed therein), *cert. denied*, 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997); *Woods v. Johnson*, 75 F.3d 1017, 1033–34 (5th Cir.1996) (rejecting the argument the terms employed in the Texas capital sentencing special issues are "aggravating factors" and, absent definitions of same, are unconstitutionally vague), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.1993)(recognizing that, unlike a weighing jurisdiction, Texas sentencing juries are not called upon to weigh statutory aggravating factors against mitigating evidence), *cert. denied*, 509 U.S. 947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993). Thus, petitioner's references to various terms employed in the Texas capital sentencing special issues as "aggravating factors" are *non sequitur*.

#### 2. Eighth Amendment No Bar to Jury's "Unfettered Discretion" at Punishment Phase of a Texas Capital Trial

Nothing in the Eighth Amendment precludes a State from granting unfettered discretion to a capital sentencing jury once the defendant has been constitutionally determined to be "eligible" to receive such penalty. In *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Supreme Court distinguished two aspects of the capital decision-making process, i.e., the "eligibility" decision and the "selection" process, and emphasized that, while both inquiries necessarily in-

---

**76.** Petition, at pp. 51–53.

**77.** State Habeas Transcript, at pp. 277–78.

volve resolution of issues that bear a factual nexus to the crime, the selection process must also focus on the character and record of the defendant. *Tuilaepa v. California,* 512 U.S. at 971–73, 114 S.Ct. at 2634–35.

The Supreme Court held in *Tuilaepa* that the Eighth Amendment addresses two different, but related, aspects of capital sentencing: the eligibility decision and the selection decision. *Id.,* 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's opinion in *Tuilaepa* represents that Court's first cohesive articulation of a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the

individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

512 U.S. at 971–73, 114 S.Ct. at 2634–35 (citations omitted).

In *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), the Supreme Court reaffirmed the vitality of the two-stage *Tuilaepa* analysis and rejected an argument that the Constitution mandates jury instructions at the selection stage of a capital sentencing proceeding which affirmatively structure the manner in which juries consider mitigating evidence. *See Buchanan v. Angelone,* 522 U.S. at 276, 118 S.Ct. at 761–62 (holding that, with regard to the selection phase of a capital sentencing process, "our decisions suggest that complete jury discretion is constitutionally permissible").

■■■ The first part of the *Tuilaepa* analysis, i.e., the eligibility decision, was discussed by the Supreme Court in *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Id.*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted). Under the Texas capital sentencing scheme, this constitutionally-mandated narrowing function is performed at the guilt-innocence phase of trial. *See Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993)(holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted five different classifications of murder for that purpose); *Woods v. Johnson,* 75 F.3d at 1033–34 (recognizing the constitutionally narrowing function is performed in Texas at the guilt-innocence phase of a capital murder trial). At the selection phase, a sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Buchanan v. Angelone,* 522 U.S. at 276, 118 S.Ct. at 761. However, as explained in *Buchanan,* the Supreme Court has never held that granting capital sentencing juries complete discretion at the selection phase violates the Eighth Amendment. *Buchanan v. Angelone,* 522 U.S. at 276, 118 S.Ct. at 761–62. On the contrary, the Supreme Court's opinion in *Tuilaepa* strongly suggests the opposite is actually the case. *Tuilaepa v. California,* 512 U.S. at 978–79, 114 S.Ct. at 2638–39 (suggesting the Eighth Amendment permits granting capital sentencing juries "unbridled discretion" at the selection phase).

The "eligibility" determination discussed in *Tuilaepa* and *Loving* occurred at the guilt-innocence phase of petitioner's capital murder trial. *Woods v. Johnson,* 75 F.3d at 1033–34. Thus, even assuming the lack of definitions of key terms included in petitioner's punishment phase jury charge effectively granted petitioner's jury what amounted to "unfettered discretion" in de-ciding whether to impose a sentence of death, as petitioner contends herein, that fact did not deprive petitioner of the protection of any federal constitutional right.

### 3. *Punishment Phase Instructions Did Not Preclude Jury's Consideration of Mitigating Evidence*

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone,* 528 U.S. 225, 226, 120 S.Ct. 727, 729, 145 L.Ed.2d 727 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States,* 527 U.S. 373, 390 n. 9, 119 S.Ct. 2090, 2102–03 n. 9, 144 L.Ed.2d 370 (1999) (holding the same); *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 503, 142 L.Ed.2d 521 (1998) (holding the same); *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (holding the same); *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence). The fact the jury instructions might have been erroneous as a matter of state law does not, standing alone, furnish a basis

for federal habeas corpus relief. *Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S.Ct. 2112, 2118, 124 L.Ed.2d 306 (1993); *Estelle v. McGuire*, 502 U.S. 62, 71, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983).

 This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198. This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368, 113 S.Ct. at 2669 (*quoting Boyde v. California*, 494 U.S. at 381, 110 S.Ct. at 1198).

 While it is always possible to engage in hyper-technical games of semantics, the terms included in petitioner's punishment phase jury charge which he identifies as "vague" are no less so than numerous, similar terms which the Fifth Circuit has repeatedly held to possess a "common sense" meaning when interpreted by reasonable jurors. *See, e.g., Hughes v. Johnson*, 191 F.3d at 615 (holding the term "probability" used in the Texas capital sentencing special issues does not require a definition); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir.1993)(holding the terms "probability" and "society" have a common sense meaning), *cert. denied*, 511 U.S. 1026, 114 S.Ct. 1416, 128 L.Ed.2d 87 (1994); *James v. Collins*, 987 F.2d at 1120 (holding the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," have a common-sense core of meaning that criminal juries should be capable of understanding); *Barnard v. Collins*, 958 F.2d 634, 641 (5th Cir.1992) (holding the terms "deliberateness," "probability," and "society" were not so vague as to deprive the jury of meaningful guidance in its deliberations), *cert. denied*, 506 U.S. 1057, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993); *Milton v. Procunier*, 744 F.2d 1091, 1095–96 (5th Cir.1984)(holding the terms "probability" and "criminal acts of violence" each have a plain meaning), *cert. denied*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

Petitioner has not identified any potentially mitigating evidence admitted during his trial which he alleges his jury was unable to adequately consider by virtue of the language employed in his punishment-phase jury instructions. Absent some showing petitioner's jury might have reasonably construed petitioner's punishment phase jury instructions so as to foreclose it from giving mitigating effect to any evidence then before it, petitioner's complaints regarding the use of various allegedly "vague" terms in his punishment phase jury instructions do not present a constitutional complaint.

### 4. *Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's assertions of unconstitutional vagueness in his punishment-phase jury instructions was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### D. *Teague Foreclosure*

Furthermore, because the Supreme Court's opinions discussed above implicitly, if not explicitly, rejected the legal premise underlying petitioner's fourth claim herein, adoption of the rule advocated by petitioner in his fourth claim herein is foreclosed by the non-retroactivity principle of *Teague*.

### VI. *Ineffective Assistance by Trial Counsel*

#### A. *The Claims*

In his second claim for federal habeas relief, petitioner argues his trial counsel rendered ineffective assistance by failing to: (1) seek removal of a disqualified juror, (2) investigate and present evidence showing the telephone lines at the victims' residence had never been repaired, (3) present expert forensic evidence challenging the medical examiner's opinion that Martha Sanchez had been the victim of an attempted sexual assault, (4) request a jury instruction at the guilt-innocence phase of trial requiring jury unanimity on a specific factual theory of capital murder before a guilty verdict could be returned, (5) object to the admission of victim-impact testimony at the guilt-innocence phase of trial, and (6) object to the prosecution's arguments at the punishment phase of trial referencing victim-impact evidence.[78]

#### B. *Clearly Established Federal Law*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth

Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of

---

78. Petition, at pp. 24–50.

counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir.2003), *cert. denied*, 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, —— U.S. ——, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

### C. *Failure to Seek Removal of Venire Member Clarita Gonzales*

#### 1. *State Court Disposition*

Venire member Clarita Gonzales completed a juror questionnaire on which she checked a box indicating she had never been either an accused, a complainant, nor a witness in a criminal case.[79] Mrs. Gonzales also answered a series of questionnaire inquiries in which she denied she had ever been arrested, charged, prosecuted, convicted, or placed on probation for any shoplifting or theft offense.[80] In addition, the prosecution furnished petitioner's trial counsel with a criminal record report which indicated Mrs. Gonzales had no criminal convictions.[81]

Nonetheless, at the conclusion of her voir dire examination by the prosecution, the following series of exchanges occurred:

Q. I think that's all I have for you. Thank you very much.

A. The only thing I do really want to get off my chest, it has been bothering me, I remember I think you stating that you had something happen that was fairly embarrassing to you at a later date and this was many, many years ago. I had stole some earrings and I wanted to get

---

79. State Habeas Transcript, at p. 67.

80. State Habeas Transcript, at pp. 75–76.

81. S.F. State Habeas Hearing, Volume 1 of 2, testimony of Richard Langlois, at pp. 33–35.

that off my chest because I remember ya'll saying if you did any crimes you better tell us now.

Q. Okay. That was—

A. That was 30 years ago, but that was in—I mean, that just stuck to my mind, you know, I have got to lay it out. I don't want them to say, you know, "Well, you didn't tell me that incident." I know it's a minor thing, but to me it was just something that I had to get off my chest, to let ya'll know that.

Q. We appreciate your honesty. Did anything happen as a result of that?

A. No. I think my parents, because I was so young, I think they paid $25 or something like that, but like I said, it was like 30–something years ago, but that was something and I notice that you said something about shoplifting, criminal records and all that. Like I said, to me that was just so embarrassing and it was such a young age, I said I have got to tell them. I know I just had to get it off my chest.

Q. We really do appreciate your honesty. Thank you.

(Discussion off the record.)

MS. HINOJOSA: Your Honor, we will accept

THE COURT: Hold on just a second, ma'am. Let me clarify on that. You know, we are not nitpicking, but we just have to be clear on the record. You are saying your parents paid 25 bucks. I mean, is this the store owner and your parents worked it out or—

MS. GONZALES: No, sir. I think actually it was some court, I am not sure, that they paid a fine, but I don't recall.

THE COURT: Okay. You weren't—

MS. GONZALES: I mean, they didn't say "You are guilty, you are on probation," or anything. I mean—

THE COURT: Okay.

MS. HINOJOSA: May I ask a few questions?

THE COURT: Yes.

*Questions by Ms. Hinojosa:*

Q. Ms. Gonzales, how old were you approximately at the time this occurred?

A. I think I was like 14.

Q. You were still a juvenile?

A. Yes, ma'am.

THE COURT: You may inquire.

(Discussion held off the record.) [82]

Thereafter, petitioner's trial counsel questioned Mrs. Gonzales but inquired no further regarding her criminal history or theft conviction.[83] Petitioner's trial counsel then accepted Mrs. Gonzales for service on petitioner's petit jury.[84]

Petitioner attached to his state habeas corpus application a computer printout from the Texas Department of Public Safety dated March 17, 2000, indicating Clarita Iris Gonzales had been convicted of larceny under five dollars on May 22, 1975, i.e., at age 19.[85] The date of birth given on the report for Clarita Iris Gonzales matched Mrs. Gonzales' birth date as indicated on her juror questionnaire answers.[86]

---

**82.** S.F. Trial, Volume 7, voir dire examination of Clarita R. Gonzales, at pp. 19–21.

**83.** *Id.,* at pp. 21–34.

**84.** *Id.,* at p. 34.

**85.** State Habeas Transcript, at pp. 82–84.

**86.** *Compare* State Habeas Transcript, at p. 83, with State Habeas Transcript, at pp. 68.

During petitioner's state habeas corpus proceeding, petitioner's lead trial counsel testified: (1) while the prosecution had given him a computer printout showing Mrs. Gonzales had no criminal convictions, he suspected her theft conviction probably had "fallen through the crack" because it was from a municipal court, (2) while he had an investigator, he did not send his investigator to Austin to do a thorough search of the criminal histories of any of the members of the jury venire, (3) he did not see the need for sending an investigator to Austin to check on Mrs. Gonzales' criminal history at the time of petitioner's trial, (4) he would have been happy to have someone on the jury with a conviction, (5) he did not strike Mrs. Gonzales when given the opportunity to do so, (6) in her questionnaire answers, Mrs. Gonzales indicated she was "somewhat" in favor of the death penalty, (7) that response is often the most favorable one a defendant can hope to obtain because many potential jurors who strongly oppose the death penalty are often successfully challenged for cause, (8) he preferred to reserve his peremptory challenges for members of the jury venire who strongly favored the death penalty, (9) Mrs. Gonzales' questionnaire answers indicated a reluctance on her part to erroneously send someone to prison, and (10) that fact weighed strongly in the decision to keep Mrs. Gonzales on the jury.[87]

The state habeas trial court determined petitioner's complaint of ineffective assistance concerning Mrs. Gonzales failed to satisfy either prong of *Strickland* because: (1) petitioner's trial counsel made "a sound strategic decision" to allow Mrs. Gonzales to remain on the jury panel based on her questionnaire and voir dire answers, i.e.,

her statements indicating she was afraid of convicting the wrong person and only "somewhat" favored the death penalty, and (2) said counsel had no reason to question her voir dire testimony that the criminal episode in question had occurred when she was a juvenile.[88]

### 2. AEDPA Review

#### a. No Deficient Performance

▆▆▆▆ Having independently reviewed the record from petitioner's trial, direct appeal, and state habeas corpus proceeding, this Court concludes the Texas Court of Criminal Appeals' reasonably concluded the failure of petitioner's trial counsel to further investigate Mrs. Gonzales' criminal background, move to strike her for cause, or exercise a peremptory challenge against her did not cause the performance of said counsel to fall below an objective level of reasonableness.

As this Court has noted in the past, the selection of a jury is "more art than science." *Cordova v. Johnson*, 993 F.Supp. 473, 530 (W.D.Tex.1998), *appeal denied* 157 F.3d 380 (5th Cir.1998) [table], *cert. denied*, 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999). Petitioner's trial counsel owed petitioner no duty to investigate every possible ground for disqualification of every member of petitioner's jury venire. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied*, 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993). Petitioner's trial counsel reasonably relied on the information regarding Mrs. Gonzales' criminal history that was then available to

---

**87.** S.F. State Habeas Hearing, Volume 1 of 2, testimony of Richard Langlois, at pp. 32–35, 41, & 46–49.

**88.** State Habeas Transcript, at p. 274.

him including Mrs. Gonzales' voir dire testimony. *See Mayo v. Cockrell*, 287 F.3d 336, 341 (5th Cir.2002) (holding trial counsel acted in an objectively reasonable manner in relying on the state trial judge's generic juror screening questions and the jurors' written questionnaire answers to identify those members of the jury venire who were unqualified for jury service), *cert. denied*, 537 U.S. 975, 123 S.Ct. 443, 154 L.Ed.2d 332 (2002).

Furthermore, petitioner's trial counsel reasonably concluded further investigation into Mrs. Gonzales' criminal background was unnecessary because, even if such an investigation showed she had a disqualifying criminal conviction, her questionnaire answers rendered her potentially more favorably disposed to the defense than other members of petitioner's jury venire. This objectively reasonable, strategic reasoning motivated petitioner's trial counsel's decision-making during jury selection.[89]

### b. *No Prejudice*

■ Moreover, even if petitioner's trial counsel had successfully challenged Mrs. Gonzales for cause or exercised a peremptory strike against her, there is no reasonable probability that such action would have altered the outcome of either phase of petitioner's capital murder trial.

■ There was no evidence before the state habeas court, and is none before this Court, establishing Mrs. Gonzales was actually biased in any manner against petitioner or in favor of the prosecution. Furthermore, no presumption of bias arises simply because Mrs. Gonzales erroneously described her previous theft conviction as having occurred when she was a juvenile. *See United States v. Bishop*, 264 F.3d 535, 554–57 (5th Cir.2001) (holding no presumption of bias arose where a venire member mistakenly failed to disclose during voir dire she had previously been convicted of a felony because she had received deferred adjudication), *cert. denied*, 535 U.S. 1016, 122 S.Ct. 1605, 152 L.Ed.2d 620 (2002). Bias cannot be presumed based on a venire member's failure to disclose a prior felony conviction, regardless of whether that failure to disclose was due to a mistake or a deliberate attempt to conceal a basis for disqualification. *United States v. Bishop*, 264 F.3d at 555–56. A finding that an individual who served on a capital murder jury was disqualified under state law from jury service does not, standing alone, establish the same individual was so biased or so partial as to deprive the defendant of his *federal* constitutional rights. *See Montoya v. Scott*, 65 F.3d 405, 418–20 (5th Cir.1995) (recognizing the issue of juror disqualification under state law and a showing of bias are two, entirely different issues), *cert. denied*, 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996).

Even assuming Mrs. Gonzales would have been struck had petitioner challenged her for cause, the failure of petitioner's trial counsel to make such a challenge did not deprive petitioner of a fundamentally fair trial. *See Fuller v. Johnson*, 158 F.3d 903, 908 (5th Cir.1998) (holding a convicted capital murder defendant's complaint that one of his jurors was disqualified from jury service under Texas law failed to assert a basis for federal habeas relief in the absence of a showing the juror's service rendered the entire trial fundamentally unfair), *cert. denied*, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).

■ Finally, the evidence presented during both phases of petitioner's trial overwhelmingly favored the prosecution. When viewed in the light most favorable to the jury's verdict, the evidence at the guilt-innocence of petitioner's trial established the petitioner: (1) ingested signifi-

---

**89.** *See* note 87, *supra,* and accompanying text.

cant quantities of alcohol and narcotics on the night of his offense, (2) cut or pulled loose the telephone lines leading into his victims' house, (3) entered that house through a window and went immediately to the kitchen, where he obtained two knives, (4) ignored the screams of an unarmed woman who had previously rejected his sexual advances as he stabbed her six times, twice fatally, (5) stabbed her 10-year-old son in the chest, (6) laid a bloody knife on the dead or dying woman's body before he fled the scene, (7) obtained and rode a bicycle to his home, a distance in excess of ten miles, and (8) telephoned police and falsely stated he had awakened with blood on his hands and could not remember what he had done the night before. "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fall." *Green v. Lynaugh*, 868 F.2d 176, 177 (5th Cir.1989), *cert. denied*, 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989). There is no reasonable probability that, but for Mrs. Gonzales' presence on the jury, the jury's verdict of "guilty" would have been different.

The evidence before the jury at the punishment phase of petitioner's trial was equally overwhelming. The jury heard testimony establishing: (1) the petitioner and one of his brothers had engaged in a series of armed robberies, (2) after his arrest, petitioner told a police officer that he had been prepared to shoot the officer during a traffic stop, (3) during a presentencing interview, petitioner had denied any history of child abuse or drug abuse, (4) after pleading guilty to four counts of armed robbery and receiving deferred adjudication probation, petitioner lured a mentally challenged teenager away from her school and raped her. From the petitioner's obvious attempts during his trial testimony to rationalize his conduct on the

night in question, the jury was free to infer petitioner felt no remorse for his fatal stabbing of Martha Sanchez. Most significant of all, the petitioner admitted during his trial testimony: (1) violence made him feel good, and (2) prior to fatally stabbing Martha Sanchez, he told his wife he was thinking of killing someone. In mitigation, petitioner offered the jury only the largely double-edged testimony of family members and friends establishing that petitioner: (1) had been the victim of an alcoholic, physically abusive father, (2) during petitioner's childhood, his family life had been characterized by extensive abuse of alcohol and drugs, but (3) petitioner was a loving father and son, who helped his family financially and otherwise. Under such circumstances, there is no reasonable probability that, but for the presence of Mrs. Gonzales, petitioner's jury would have found that either (1) petitioner did *not* present a risk of future dangerousness or (2) the petitioner's meager mitigating evidence warranted a life sentence for petitioner.

#### c. *Conclusion*

The Texas Court of Criminal Appeals' determination that petitioner's first assertion of ineffective assistance failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### D. *Failure to Investigate and Present Evidence Concerning Phone Lines*

#### 1. *State Court Disposition*

No less than three prosecution witnesses testified at trial that, on the day of or the day after the offense, they observed both

of the telephone lines leading into the rear of the victims' house at 250 Future had been cut or pulled loose.[90] Petitioner presented testimony and business records during his state habeas corpus proceeding showing that no telephone service call or line repairs had been requested or made to the victims' residence following the date of the offense.[91] However, the petitioner's state habeas witness admitted he could not offer any testimony showing the lines had *not* been cut or pulled loose or explaining why no service or repair request had been made.[92] The state habeas court concluded petitioner had failed to satisfy either prong of *Strickland.*[93]

### 2. AEDPA Review

■ Martha Sanchez's husband testified at trial he moved out of the house in question shortly after the murder and he never had the phone lines repaired or reconnected.[94] Petitioner offered no testimony or other evidence during his state habeas corpus proceeding showing the phone lines at 250 Future were intact immediately *after* Martha Sanchez's murder or that any of the prosecution's trial testimony regarding the lines having been damaged was inaccurate. In view of the uncontested trial testimony of Martha Sanchez's husband, petitioner stood to gain nothing by calling telephone company officials to testify at trial in a manner that, at best, would merely have confirmed his testimony he had never requested the reconnection or repair of the telephone lines in question.

Petitioner does not allege any facts, much less present any evidence, showing any possible advantage or benefit he would have derived from presenting trial testimony from telephone company officials similar to that which he presented during his state habeas corpus proceeding. Such testimony would have had no exculpatory, mitigating, or impeachment value whatsoever at trial. Petitioner's trial counsel cannot be faulted for failing to present such meaningless evidence. There was nothing objectively unreasonable in the failure of petitioner's trial counsel to present evidence corroborating the testimony of a prosecution witness. Likewise, there is no reasonable probability that, but for the failure of petitioner's trial counsel to present such evidence, the outcome of either phase of petitioner's trial would have been any different. This aspect of petitioner's multi-faceted ineffective claim satisfies neither prong of *Strickland.*

The Texas Court of Criminal Appeals' determination on the merits that this aspect of petitioner's complaints about his trial counsel's performance failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### E. Failure to Present Forensic Evidence

#### 1. State Court Disposition

Petitioner argues his trial counsel should have presented expert opinion testimony

---

**90.** S.F. Trial, Volume 15, testimony of Oscar D. Ochoa, at pp. 43–44; Volume 15, testimony of Josie Garcia, at pp. 127–28; Volume 16, testimony of Reginald Walter Freeman, at pp. 106–07.

**91.** *See* note 50, *supra,* and accompanying text.

**92.** S.F. State Habeas Hearing, Volume 1 of 2, testimony of Richard Parr, at pp. 15–17.

**93.** State Habeas Transcript, at p. 271.

**94.** S.F. Trial, Volume 15, testimony of Oscar D. Ochoa, at p. 44.

challenging the medical examiner's conclusion Martha Sanchez's body displayed a "classic" pattern of injuries consistent with attempted sexual assault.[95]

Petitioner presented testimony during his state habeas corpus proceeding from a pathologist establishing: (1) his review of the photographs from Martha Sanchez's autopsy led him to conclude one of the abrasions on Martha's thigh showed too much inflammation to have been caused during her fatal assault and (2) he did not agree with the trial testimony of the medical examiner who opined the pattern of Martha's bruises and abrasions was consistent with those of someone who was resisting the effort of her attacker to force Martha's legs apart.[96] However, this witness's testimony was far from unequivocal. He admitted the pathology of Martha's injuries alone neither validated nor invalidated the theory of attempted sexual assault.[97] The state habeas court found petitioner's trial counsel had been surprised by the medical examiner's trial testimony that the pattern of Martha's injuries were consistent with those of someone who had resisted an attempted sexual assault.[98] The state habeas court also concluded petitioner's complaint about his trial counsel's failure to present expert testimony similar to that presented during petitioner's state habeas corpus hearing satisfied neither prong of *Strickland*.[99]

### 2. AEDPA Review

■ The thrust of the petitioner's pathologist's testimony during petitioner's state habeas hearing was that one of the abrasions on Martha's thigh showed too much inflammation to have resulted from injuries she received immediately before her death. However, the petitioner's pathologist admitted he had reviewed only autopsy notes and photographs and he was relying primarily on his perception from photographs of the color of a single abrasion to determine the level of inflammation in that wound. Moreover, the medical examiner's unchallenged testimony was that Martha Sanchez had not died instantaneously but had bled to death from stab wounds to her heart and lung. Petitioner's expert at the state habeas hearing did not question any of the medical examiner's findings regarding the location or nature of Martha's other injuries. Thus, petitioner's expert did not controvert any of the trial testimony establishing that Martha sustained (1) bruising to both her forearms, (2) bruising to the anterior and lateral portions of both her legs, (3) bruises to both the medial aspect of the right knee, (4) bruises to the inner aspect of the right

---

**95.** Petition, at pp. 29–30 & 45. While petitioner argues his expert witness testified during petitioner's state habeas corpus hearing the "bruising on the complainant was too remote in time to have been caused by any struggle immediately prior to the death of the complainant," Petition, at p. 45, this is *not* what the petitioner's expert pathologist testified during petitioner's state habeas hearing. On the contrary, petitioner's expert pathologist testified only that a single *abrasion* on Martha's thigh showed too much inflammation to have been caused immediately before her death and was likely caused by an injury that occurred several hours before her demise. S.F. State Habeas Hearing, Volume 1 of 2, testimony of Paul Radelat, at pp. 21–22

& 26. Petitioner's expert witness offered no testimony during petitioner's state habeas hearing challenging any of the medical examiner's trial testimony regarding the location, appearance, or freshness of any of the many *bruises* found on Martha's body.

**96.** S.F. State Habeas hearing, Volume 1 of 2, testimony of Paul Radelat, at pp. 20–22 & 26–28.

**97.** *Id.*, at pp. 28–29.

**98.** State Habeas Transcript, at p. 274.

**99.** *Id.*

thigh just above the knee, and (5) bruises to the medical aspect just below the left knee.[100] From this detailed testimony, which petitioner's expert did not controvert, together with the fact Martha had suffered only stab wounds and not any slashing wounds indicative of fighting off a knife attack, the jury had no rational basis to disagree with the medical examiner's conclusion that someone had grabbed Martha's legs forcefully around the knees and thighs before plunging a knife into her chest and neck six times.

While the petitioner's expert disagreed with the medical examiner's trial testimony that the pattern of Martha's injuries suggested attempted sexual assault, petitioner was not charged with sexual assault or attempted sexual assault. Petitioner was charged with murder in the course of burglary and, alternatively, murder in the course of attempted sexual assault. Petitioner's own trial testimony established beyond any doubt: (1) he was the person who fatally stabbed Martha Sanchez, (2) Martha had previously rebuffed petitioner's sexual advances yet he still wanted to have sex with her, and (3) he had told his wife prior to the murder that violence made him feel good and he had thought about killing someone. Because there was no disagreement between the experts regarding the existence or location of the extensive bruising to Martha's thighs and knees, the jury was free to draw its own conclusions regarding *why* Martha's assailant had grabbed her and bruised her legs *before* fatally stabbing her.

Under such circumstances, the state habeas court could have reasonably concluded petitioner's trial counsel had not acted in an objectively unreasonable manner in failing to present opposing forensic opinion

testimony regarding the pattern of Martha's injuries. Such testimony would have focused the jury's attention on an issue that was not ultimately determinative of petitioner's guilt because it was irrelevant to the prosecution's overwhelming evidence showing petitioner murdered Martha in the course of burglarizing her home. Regardless of whether petitioner attempted to sexually assault Martha before he fatally stabbed her, the evidence was overwhelming petitioner pulled loose or cut the telephone lines at the back of her home before entering that house through a front window and he went directly to the kitchen to secure deadly weapons immediately upon entering the house. The bottom line is the medical examiner's trial testimony established Martha had been assaulted extensively before she was fatally stabbed. Petitioner's expert disagreed with the medical examiner's opinion as to whether the assault was sexual in nature but did not controvert any of the medical examiner's findings regarding the locations or freshness of any of Martha's *bruises*.

Moreover, the state habeas court reasonably concluded there was no reasonable probability that, but for the absence of petitioner's expert testimony regarding the age of the abrasion on Martha's thigh, the outcome of either phase of petitioner's trial would have been any different. While trial testimony along the lines of that offered by petitioner's pathologist during petitioner's state habeas hearing might have furnished some basis for challenging the medical examiner's opinion regarding the motivation of Martha's attacker, no testimony offered by petitioner's pathologist cast any doubt on the medical examiner's factual *findings* regarding the location, number, or freshness of the bruising found on Martha's

**100.** S.F. Trial, Volume 16, testimony of Jan Garavaglia, at pp. 226–31, 234–35, 237, & 239–40.

forearms, legs, and knees. Nor did petitioner's expert question the medical examiner's *findings* of mud on Martha's legs, foot, hands, and face. More significantly, nothing offered by petitioner's expert witness during the state habeas hearing cast any doubt on the extensive evidence at trial showing that petitioner: (1) entered Martha's house through a window after cutting or pulling loose the telephone lines leading into the house, (2) went directly to the kitchen where he obtained two knives, (3) went next to Martha's bedroom where he fatally stabbed her multiple times and stabbed Erick Martinez in the chest when the boy attempted to intervene to protect his mother, and (4) placed a bloody knife on top of Martha's body before he fled the house. "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fall." *Green v. Lynaugh*, 868 F.2d 176, 177 (5th Cir.1989), *cert. denied*, 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989). The evidence of petitioner's intentional burglary, intentional assault, and intentional murder of Martha was overwhelming.

The Texas Court of Criminal Appeals' conclusion petitioner's complaint about his trial counsel's failure to offer expert forensic opinion testimony along the lines of that furnished by petitioner's state habeas expert failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### F. Failure to Request Unanimity Instruction

#### 1. State Court Disposition

Petitioner argues his trial counsel should have requested a jury instruction at the guilt-innocence phase of trial requiring the jury to reach a unanimous verdict with regard to a particular theory of capital murder before it could return a "guilty" verdict.[101] The state habeas court rejected the contention out of hand noting no such requirement had ever been recognized.[102]

#### 2. AEDPA Review

█ This aspect of petitioner's multifaceted ineffective assistance claim is premised on the same groundless argument petitioner raised in his third claim herein, discussed at length in Section IV above. Simply put, there is no "clearly established" Supreme Court precedent mandating that a jury faced with an indictment charging the defendant with a single count of capital murder, i.e., the murder of a single individual, and multiple allegations of factual theories sufficient to elevate that murder to a capital offense, reach a unanimous verdict with regard to the particular factual theory necessary to elevate an ordinary murder to a capital offense. On the contrary, as explained at length in Section IV.C. above, a majority of the Supreme Court rejected precisely such an argument in *Schad v. Arizona*. As a matter of federal constitutional principle, there is no requirement a jury reach unanimity on the particular factual theory that elevates an ordinary murder to a capital murder. *Schad v. Arizona*, 501 U.S. 624, 631–32, 111 S.Ct. 2491, 2496–97, 115 L.Ed.2d 555

---

101. Petition, at pp. 31–32 & 46–47.

102. State Habeas Transcript, at p. 275.

(1991)(plurality opinion of Justice Souter, Chief Justice Rhenquist, and Justices O'Connor and Kennedy); *Schad v. Arizona*, 501 U.S. at 649–50, 111 S.Ct. at 2506 (Justice Scalia's separate concurring opinion in which he specifically agreed with the plurality's determination the jury need not agree on the mode of commission of a single crime when that offense can be committed in various ways). Nor has petitioner identified any state authority mandating such a requirement or jury instruction.

The failure of petitioner's trial counsel to request what would have been a clearly erroneous jury instruction neither caused the performance of said counsel to fall below an objective level of reasonableness nor prejudiced petitioner within the meaning of *Strickland*. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir.2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir.1998)(nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997) (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998); *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir.1998) (holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied*,

525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998); *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995)("Counsel cannot be deficient for failing to press a frivolous point."); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir.1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990) ("[C]ounsel is not required to make futile motions or objections."); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir.1984)("Counsel is not required to engage in the filing of futile motions.").

The Texas Court of Criminal Appeals' determination that this aspect of petitioner's multi-faceted ineffective assistance claim failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### G. Victim Impact Evidence and Argument

#### 1. State Court Disposition

Petitioner argues extensive evidence concerning the physical and emotional injuries sustained by Erick Martinez was admitted at both phases of trial, additional testimony concerning Erick's younger sister Brianna's emotional trauma was introduced during the punishment phase of trial, and the prosecution made numerous references to same during closing argument at the punishment phase of trial.[103] The state habeas court concluded all of the testimony in question was admissible.[104]

---

**103.** Petition, at pp. 32–29 & 47–50.

**104.** State Habeas Transcript, at p. 275.

2. *AEDPA Review*

a. *Guilt–Innocence Phase of Trial*

 Insofar as petitioner complains about his trial counsel's failure to object to the admission of alleged "victim-impact" testimony at the guilt-innocence phase of his trial detailing the physical and emotional injuries sustained by Erick Martinez and the physical and emotional condition of Erick's younger sister Brianna immediately after the offense, that complaint is frivolous. At the time of petitioner's trial, Texas law clearly authorized the admission of evidence showing the total circumstances of a criminal offense, including "same transaction contextual evidence" relating to additional victims when such evidence was essential to understanding the context and circumstances of the offense. *See Cantu v. State*, 939 S.W.2d 627, 636 (Tex.Crim.App.1997)(holding admissible at a capital murder trial evidence regarding the gang rape and murder of the companion of the victim named in the indictment where both young women were murdered in the course of the same criminal transaction), *cert. denied*, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997); *Nelson v. State*, 864 S.W.2d 496, 498–99 (Tex.Crim.App.1993)(holding admissible evidence showing a second woman was also sexually assaulted and stabbed in the course of the sexual assault and murder of the victim named in the indictment), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994).

Erick Martinez was not merely the son of a murder victim, he was an eyewitness to, as well as an additional victim of, petitioner's acts of violence on the date in question. It was undisputed Brianna slept in the bed next to Martha and had her mother's blood on her face, hands, and pajamas when Adrian Gonzales and Sylvia Montenegro arrived at the scene minutes after Erick first pounded frantically on their front door. Evidence establishing the nature and extent of Erick's physical condition as well as his emotional state immediately after the offense was directly relevant to the issue of the credibility of Erick's identifications of petitioner as his mother's, as well as his own, assailant. Likewise, evidence showing Brianna's physical and emotional state immediately after witnessing her mother's murder was necessary to understand the full context of petitioner's offense. In sum, evidence regarding eyewitnesses Erick and Brianna's physical injuries and emotional state was inextricably intertwined with the facts and circumstances of petitioner's offense.

Therefore, any objection to the admission of testimony relating to Erick or Brianna's physical or emotional condition immediately after their mother's murder on the ground that such evidence was "victim impact" evidence would have been legally frivolous. The failure of petitioner's trial counsel to make such a frivolous objection neither caused the performance of said counsel to fall below an objective level of reasonableness nor "prejudiced" petitioner within the meaning of *Strickland*. *See Emery v. Johnson*, 139 F.3d at 198 (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance); *Meanes v. Johnson*, 138 F.3d at 1012 (holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established).

b. *Punishment Phase of Trial*

 Insofar as petitioner complains about the admission of true "victim impact" testimony at the punishment phase of his capital trial and the prosecutor's arguments based thereon, that complaint

is legally frivolous. Both the admission of evidence of the impact of a capital murder on the victim and his or her survivors, as well as prosecutorial jury argument regarding same, are constitutionally permissible at the punishment phase of a capital murder trial. *Payne v. Tennessee,* 501 U.S. 808, 825–26, 111 S.Ct. 2597, 2608–09, 115 L.Ed.2d 720 (1991).

The failure of petitioner's trial counsel to object to the admission of victim impact evidence during the punishment phase. of trial or to prosecutorial argument based thereon neither caused the performance of said counsel to fall below an objective level of reasonableness nor "prejudiced" petitioner within the meaning of *Strickland.* *See Felder v. Johnson,* 180 F.3d 206, 216 (5th Cir.1999) (holding admissible at the punishment phase of a Texas capital murder trial testimony regarding the victim's good nature and positive reputation), *cert. denied,* 528 U.S. 1067, 120 S.Ct. 630, 145 L.Ed.2d 520 (1999); *Castillo v. Johnson,* 141 F.3d 218, 224 (5th Cir.1998)(holding a complaint about the admission of victim-impact testimony at the punishment phase of a Texas capital murder trial did not state a basis for federal habeas corpus relief), *cert. denied,* 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998); *Westley v. Johnson,* 83 F.3d 714, 723 (5th Cir.1996) (rejecting complaint the petitioner's state trial counsel rendered ineffective assistance by failing to object to victim-impact testimony at the punishment phase of a Texas capital murder trial), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997); *Black v. Collins,* 962 F.2d 394, 408 (5th Cir.1992)(holding admission of testimony regarding the impact of the victim's death on the victim's son and mother did not render the petitioner's trial funda-

mentally unfair), *cert. denied,* 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992).

### H. *Conclusions*

None of petitioner's complaints regarding the performance of his trial counsel satisfy either prong of *Strickland.* Therefore, the state habeas court's rejection on the merits of all of petitioner's ineffective assistance claims regarding the performance of petitioner's trial counsel was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## VII. *Ineffective Assistance by Appellate Counsel*

### A. *The Claim*

In his final claim for relief herein, petitioner argues his state appellate counsel rendered ineffective assistance by failing to timely notify petitioner of the final disposition of petitioner's direct appeal so as to permit petitioner to file a petition for writ of certiorari with the United States Supreme Court.[105]

### B. De Novo *Review*

 Petitioner "fairly presented" this same complaint to the state habeas court in his supplement state habeas corpus application.[106] However, the state habeas court made no mention of that claim whatsoever in its findings of fact and conclusions of law. Because the state habeas court made no factual findings or conclusions of law addressing this claim, this court's review of this claim is necessarily *de novo.* *See Rompilla v. Beard,* —— U.S.

---

**105.** Petition, at pp. 54–55.

**106.** State Habeas Transcript, at pp. 251–53.

——, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding that *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003)(holding the same); *Solis v. Cockrell*, 342 F.3d 392, 394 n. 2 (5th Cir. 2003) (holding the AEDPA's deferential standard of review inapplicable when a claim has not been adjudicated on the merits in state court), *cert. denied*, 540 U.S. 1151, 124 S.Ct. 1149, 157 L.Ed.2d 1045 (2004).

The fundamental problem with petitioner's complaint about the performance of his appellate counsel is that it is clear in this Circuit that a trial counsel's failure to timely notify a criminal defendant of the final disposition of the defendant's direct appeal implicates no federal constitutional right. *See Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.2002)(holding the constitutional right to counsel terminates once the appellate court issues its opinion and, therefore, appellate counsel's failure to notify the defendant of the outcome of the appeal cannot furnish a basis for a claim of ineffective assistance on appeal), *cert. denied*, 538 U.S. 969, 123 S.Ct. 1768, 155 L.Ed.2d 526 (2003); *Jackson v. Johnson*, 217 F.3d 360, 364–65 (5th Cir.2000) (holding the constitutional right to the assistance of counsel on appeal does not extend to the filing of a motion for rehearing following disposition of the defendant's direct appeal).

**VIII.** *Request for Evidentiary Hearing*

▇▇▇▇ Petitioner requests an evidentiary hearing. However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor*, 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000)(prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if: (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence *and* (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense. *Foster v. Johnson*, 293 F.3d 766, 775 n. 9 (5th Cir. 2002), *cert. denied*, 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir.2000), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); 28 U.S.C. § 2254(e)(2).

Petitioner was afforded a full and fair opportunity to develop and litigate his claims for relief herein during his state habeas corpus proceeding. Petitioner has presented this Court with no new evidence or factual theories supporting any of his claims herein that were unavailable to him, despite the exercise of due diligence, during his state habeas corpus proceeding.

Likewise, petitioner does not identify any new legal theories supporting his claims for relief herein that were unavailable at the time petitioner filed and litigated his state habeas corpus claims. Petitioner does not offer any rational explanation for his failure to fully develop any and all evidence supporting his claims herein during his state habeas evidentiary hearing. Nor does petitioner identify any additional evidence which he and his state habeas counsel were unable to develop and present to petitioner's state habeas court despite the exercise of due diligence on their part. Under such circumstances, petitioner is not entitled to a federal evidentiary hearing to further develop the facts supporting his claims herein.

## IX. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of Appealability ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

 Under the AEDPA, before a petitioner may appeal the denial of a habe-

as corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

 A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, ——, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Ten-*

*nard v. Dretke,* 542 U.S. at ——, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

 The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord, Tennard v. Dretke,* 542 U.S. at ——, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1)

the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

 In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Cardenas v. Dretke,* 405 F.3d 244, 248 (5th Cir. 2005), *cert. pending; Miller v. Dretke,* 404 F.3d 908, 913 (5th Cir.2005); *Martinez v. Dretke,* 404 F.3d 878, 884 (5th Cir.2005), *cert. pending; Bigby v. Dretke,* 402 F.3d 551, 557 (5th Cir.2005), *cert. pending; Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005).

 Petitioner procedurally defaulted on his initial claim herein for two equally compelling reasons. Additionally, petitioner's complaint of bias in the selection of Bexar County grand jurors runs contrary to well-settled Fifth Circuit case law upholding the random selection of persons from voter registration lists to fill jury venires. Petitioner's third and fourth claims herein are foreclosed by Supreme Court precedent which rejects the underlying legal premises for those claims. Petitioner's final claim herein is also at odds with well-settled Fifth Circuit case law. This Court concluded that none of petitioner's complaints about the performance of his trial counsel satisfy either prong of *Strickland.*

Nonetheless, petitioner's complaint about the failure of his trial counsel to present available expert opinion testimony regarding the pattern of injuries on Martha Sanchez's body being inconsistent with attempted sexual assault is sufficiently troubling to warrant granting petitioner a Certificate of Appealability. Petitioner's trial counsel, while admittedly caught off-guard at trial by the medical examiner's opinion that Martha's body evidenced a "classic pattern" of bruises consistent with attempted sexual assault offered no ration-

al explanation for his failure to either consult with an expert prior to trial regarding the pattern of bruising on the victim's body or move for a continuance so as to permit such consultation. It is true that a criminal trial is not a proceeding in which everything not prohibited is required of defense counsel. *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992), *cert. denied*, 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993). However, petitioner's trial counsel offered no rational explanation for his failure to at least consult with an independent expert regarding the results of the victim's autopsy once said counsel was "surprised" by the medical examiner's trial testimony. "I was surprised" is hardly a rationale for failing to undertake any investigation of critical opinion testimony offered by the prosecution. While the state habeas court implicitly determined petitioner's trial counsel did not render deficient performance by so doing, and this Court determined the state habeas court acted reasonably in so determining, reasonable jurists could disagree over this Court's assessment over the reasonableness of the state habeas court's application of the initial prong of *Strickland* on this portion of petitioner's ineffective assistance claim.

This Court reviewed the entirety of the evidence introduced during petitioner's trial and state habeas corpus proceeding and firmly believes petitioner's complaint regarding the failure of his trial counsel to put on available expert testimony challenging the medical examiner's opinion at trial fails to satisfy the prejudice prong of *Strickland*. Therefore, this Court concluded the state habeas court acted reasonably when it found no "prejudice" to support this portion of petitioner's ineffective assistance claim. Nevertheless, reasonable jurists might disagree with this Court's assessment on that point. For that reason, petitioner is entitled to a CoA with regard to this aspect of his claims herein.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's federal habeas corpus petition, filed December 5, 2003, docket entry no. 6, is **DENIED**.

3. Petitioner's motion for factual development, filed May 20, 2005, docket entry no. 9, is in all respects **DENIED**.

4. All other pending motions are **DISMISSED AS MOOT**.

5. Petitioner is **GRANTED** a Certificate of Appealability with regard to the sole issue of whether his trial counsel rendered ineffective assistance by failing to present available expert testimony controverting the medical examiner's trial testimony that the victim's body displayed a "classic" pattern of injuries consistent with attempted sexual assault; in all other respects, petitioner is **DENIED** a Certificate of Appealability.

6. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

**IT is so ORDERED.**